Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

CHEFS, COOKS, PASTRY COOKS AND ASSISTANTS, LOCAL 89, HOTEL AND RESTAURANT EMPLOYEES UNION, AFL–CIO

and

Waiters and Waitresses, Dining Room Employees, Local 1, Hotel and Restaurant Employees Union, AFL–CIO, Respondents.

United States District Court
S. D. New York.

Feb. 9, 1960.

Jacques Schurre, Washington, D. C., for National Labor Relations Board, petitioner.

Boudin, Cohn & Glickstein, New York City, for respondent, Local 89. Jerome B. Lurie, New York City, of counsel.

Pinto & Stein, New York City, for respondent, Local No. 1. Benjamin D. Stein, New York City, of counsel.

Saxe, Bacon & O'Shea, New York City, for Stork Restaurant, Inc., the Charging Party Thomas Bolan, Maurice N. Nessen, New York City, of counsel.

DAWSON, District Judge.

This proceeding comes before the Court upon the petition filed by the Regional Director of the National Labor Relations Board, pursuant to § 10($l$) of the National Labor Relations Act, as amended (hereinafter called the "Act"), § 160($l$) of Title 29 U.S.C.A. § 151 et seq., for a temporary injunction restraining the respondents, pending final disposition of the matter before the National Labor Relations Board, from picketing the Stork Restaurant, Inc., a restaurant in New York City commonly known as and hereinafter referred to as "the Stork Club."

The charge alleges that respondents engaged in an unfair labor practice within the meaning of § 8(b) (7) (C) of the Act, which prohibits certain types of picketing under certain circumstances. The particular section of the Act is part of the Landrum-Griffin Act which became effective on November 13, 1959. The petition is predicated upon the conclusion of the Board that it has reason-

able cause to believe that respondents engaged in unfair labor practices and that a complaint of the Board, based upon the charge, should issue. An order to show cause was issued by this Court, a hearing held and testimony taken.

The Court makes the following findings of fact:

[1] (1) The Stork Club is a restaurant in New York City. For several years past the volume of its business has exceeded $1,000,000 a year, and also for several years past the volume of its supplies purchased outside the State of New York was approximately $300,000 a year. The Stork Club, as a result, is found as a fact to be engaged in interstate commerce.

(2) Respondents are labor organizations engaged in this district in transacting business and promoting the interests of their members.

(3) Since on or about January 9, 1957, respondents have demanded that the Stork Club recognize them and bargain with them as the representatives of certain employees of the Stork Club. On January 7, 1957 a substantial number of the employees of the Stork Club went on strike, and the respondents began picketing the premises. It is admitted by the attorneys for the respondents that among the objectives of such picketing was "to obtain recognition by Stork as the legally designated collective bargaining representatives of Stork's employees." The attorneys for the respondents admit that picketing for this objective continued at least until January 13, 1960. Whether it continued for this objective thereafter is one of the issues before this Court.

(4) Respondents have not been certified as the representatives of employees working at the Stork Club and, although the picketing has continued for several years, no petition for an election to determine the representatives of the employees for bargaining purposes has been filed under the provisions of the Act.

(5) The Landrum-Griffin Act, which added § 8(b) (7) (C) to the Act, became effective on November 13, 1959.

(6) On or about January 6, 1960 the Stork Club executed and filed with the National Labor Relations Board a charge that the respondents were engaged in unfair labor practices in violation of said § 8(b) (7) (C) of the Act.

(7) Shortly thereafter, and on or about January 13, 1960, the officials of the unions, and their attorneys, knowing that the aforesaid charge had been filed, met and discussed the situation with reference to the Stork Club. The officials of the respondent unions were advised by their attorneys that under the Act, as amended, they were no longer entitled to picket the Stork Club to seek to obtain recognition as the bargaining representatives of the employees of the Stork Club. They determined, nevertheless, to continue picketing but also sent a letter to the National Labor Relations Board, and to the Stork Club, stating that they had decided "to cease picketing the Stork Restaurant, Inc. for the purpose of obtaining recognition and to withdraw their demand therefore" and that they had decided to continue picketing the Stork Restaurant, Inc. for the following purposes:

"1. To advise the public (including consumers) that Stork Restaurant, Inc. does not employ members of, or have a contract with, the two Unions.

"2. To advise the public (including the consumers) that the Stork Restaurant, Inc. dictatorially discharged certain employees for their membership in the Unions and interfered with the right of its employees freely to select collective bargaining representatives.

"3. To advise the public (including the consumers) that the standard union wages, hours and working conditions do not prevail in the Stork Restaurant, Inc."

(8) The picketing continued. At the sole entrance to the Stork Club on East 53rd Street, New York City, two to four pickets are present and have been present at substantially all hours of the day and night during which the Club is open,

including the hours during which deliveries of supplies would customarily be made. The pickets carried, and still carry, sandwich type signs which read substantially as follows:

"To The Public:
    The Stork Club
  Discharged Employees
  Because They Joined . . .
    Chefs, Cooks,
    Pastry Cooks,
    & Asst's Union
      Local 89 AFL-CIO"

"To The Public
    The Stork Club
  Does Not Have A
  Contract With
    Chefs, Cooks,
    Pastry Cooks,
    & Asst's Union
      Local 89 AFL-CIO"

"Stork Club
  Employees
  Do Not
  Enjoy
  Union Wages,
    Hours &
  Working Conditions"

(9) A result of the presence of pickets outside the premises of the Stork Club has been to induce individual employees of other persons, in the course of their employment, not to deliver goods to the Stork Club. The testimony of three truck drivers employed by different employers to deliver supplies of beer and brandy to the Stork Club was that when they saw the pickets outside the Stork Club, in January of this year, they drove away without making their deliveries. These truck drivers did not stop to read the signs carried by the pickets. They saw that picketing was being carried on by a labor organization and that was sufficient for them to refuse to cross the picket line and to refuse to make deliveries. The testimony of the Managing Agent of the Stork Club was that he has not been getting regular deliveries of the provisions needed for the restaurant and that "we had to buy two trucks and hire truck drivers to pick things up all over town."

(10) The picketing is still continuing and as far as the unions are concerned will, unless enjoined, continue.

### Discussion

In the light of the above facts, the application of the law must be considered.

Once a petition has been filed by the Labor Board it is the role of this Court to ascertain whether the Board had "reasonable cause to believe" that the charge was true. Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 538. It is not necessary for the Court, in order to grant relief, to find that the charges are true and that there has been, in fact, a violation of the law. The only question before the Court is whether the Board had reasonable cause to believe that there had been a violation of the law. It has been held that the requirement placed upon the Board is met by a showing of sufficient evidence to demonstrate that there was basis for the Board's finding. Douds v. International Longshoremen's Association, 2 Cir., 1957, 242 F.2d 808, 810.

The statute under which the charge is filed is a relatively new one.* Any precise reading of this statute shows

* § 8(b) "It shall be an unfair labor practice for a labor organization or its agents—
    *    *    *    *    *
"(7) to picket or cause to be picketed or threatened to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
    *    *    *    *    *
"(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or
"(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable

that in order for the picketing to be deemed an unfair labor practice, certain facts must be found. They are (1) that an object of the picketing was to force or require the employer to recognize or bargain with a labor organization; (2) that either a valid election for the determination of bargaining representatives had been held within the preceding twelve months, or that a petition had not been filed under § 9(c) of the Act for a determination of bargaining representatives within a reasonable time, not exceeding thirty days from commencement of the picketing. However, even when the picketing is for bargaining or recognitional purposes and no petition for an election has been filed, picketing is not prohibited if it is for the purpose of truthfully advising the public that an employer does not employ members of or have a contract with a labor organization, "unless the effect of such picketing is to induce any other individual employed by any other person, in the course of his employment, not to pick up, deliver or transport any goods, or not to perform any services."

There seems to be no serious dispute that picketing has been in effect for several years and is now continuing; that no petition has been filed under § 9(c) of the Act; and the effect of the picketing has been to induce employees of other employers, particularly truck drivers, not to deliver goods to the Stork Club. The respondents do not seriously contest these points. They urge, however, that the picketing cannot be an unfair labor practice unless it is for a "recognitional purpose," i. e., forcing or requiring an employer to recognize or bargain with a labor organization as the

representative of employees. The Court agrees that the Act does not ban informational picketing as such. It does two things: It bans picketing where the object is to force an employer to recognize or bargain with a labor organization, unless certain prerequisites are met; it exempts from this requirement informational picketing to inform the public that the employer does not employ members of or have a contract with a labor organization, but only in the event that such informational picketing does not induce employees of other employers to fail to pick up, deliver or transport goods, or to perform any services. Picketing which is designed for organizational plus informational purposes would fall afoul of the Act if the effect of the informational picketing was to impede those activities of employees of other persons. However, a primary question must, of course, be whether the purpose is to compel organizational or bargaining recognition. The first question, therefore, must be this: Is an object of the picketing to force the Stork Club to recognize or bargain with the respondents as representatives of its employees?

Respondents admit that this was one of the objectives of the picketing from the time picketing started in 1957 until January 13, 1960. The Landrum-Griffin Act became effective on November 13, 1959. Respondents therefore admit, in effect, that for two months the picketing was for an illegal objective. They now contend, however, that after the unfair labor practice charge was filed with the Board they changed their objective and are not now picketing for organizational or bargaining purposes, but only for informational purposes, and that therefore,

period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing

in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce an individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."

despite the fact that this picketing has impeded deliveries of goods by employees of other employers, the picketing, as such, is not prohibited by the provisions of the Act.

It may be pointed out that the provisions of the Act in question relate to picketing not merely for "recognitional" purposes but also where an objective is to "require an employer to bargain" with the union as a representative of its employees. Withdrawal of a demand for "recognition" does not solve the entire problem. There has been no indication that the unions have withdrawn their demand to bargain with the employer; picketing, either for recognitional or bargaining purposes, may be considered to be a violation of the Act.

The Court must therefore determine as a fact from the record the objective of the picketing. What is it that the unions want from this maintenance of a picket line? An indication is found in one of the signs carried by the pickets, which reads: "The Stork Club does not have a contract with Chefs, Cooks, Pastry Cooks & Asst's Union, Local 89 AFL-CIO." How can this be construed other than that the picketing will continue until there is such a contract? But a contract presupposes bargaining. It would be a naive person indeed who did not recognize that the purpose of the picketing is to force the employer to bargain with the union so that a contract may be entered into with the union. Judge Swigert in the Northern District of Indiana has pointed out:

> "It is difficult, if not impossible, to imagine any kind of informational picketing pertaining to an employer's failure or refusal to employ union members or to have a collective bargaining agreement where another object of such picketing would not be ultimate union recognition or bargaining. In most instances certainly the aim of such informational picketing could only be to bring economic pressure upon the employer to recognize and bargain with the labor organization * * ."

Getreu v. Bartenders and Hotel and Restaurant Employees Union, Local 58, D.C.N.Ind., 181 F.Supp. 738.

The Court recognizes that the objective for which picketing is conducted may change from time to time as conditions change. See National Labor Relations Board v. Local 50, Bakery & Confectionery Workers, 2 Cir., 1957, 245 F.2d 542.

■ However, a mere change in the signs carried by the pickets, or a mere unilateral declaration of policy does not necessarily change the objective of the picketing. In order to properly determine the objective of respondents' picketing, all the circumstances surrounding the picketing must be examined. McLeod v. Local 239, International Brotherhood of Teamsters, D.C.E.D.N.Y., 179 F.Supp. 481, Bartels, J.

■ Taken as a whole the record presents a substantial basis of evidence that the picketing now being conducted has for its objective to force or require the Stork Club to bargain with the respondent unions. Respondents contend that the only purpose of the picketing is to let the public know that the Stork Club does not have a contract with the respondent unions and that the Stork Club does not maintain the wages, hours and working conditions found in union restaurants, all with the idea of persuading the public not to patronize the Stork Club but rather to go to restaurants which have entered into contracts with the respondent unions and which maintain the wages, hours and working conditions found in such union shops. The evidence shows that the picketing has made it difficult and more expensive to get supplies to the Stork Club; there is no evidence that the presence of the picket line has diminished the number of the Stork Club's patrons, which the unions contend is the primary object of the picketing.

Even though the immediate objective of the picketing may be to divert business to union restaurants, it is obvious that this is merely a step to the ultimate objective, which is to force the Stork

Club to bargain with the unions as representatives of its employees. The immediate objective may be to divert business from the Stork Club; the ultimate objective, obviously, is to put the unions in a position to act as bargaining agents for the employees and to force the Stork Club to recognize this condition.

■ The Stork Club is, as a result, impaled on the horns of a dilemma. Since the unions admittedly do not represent the majority of the employees working in any category for the Stork Club, the Stork Club cannot recognize the unions as representatives of its employees. If the unions did represent such majority of the employees they could easily demand an election before the National Labor Relations Board, and if the election showed that they represent the majority of the employees they could be certified as the bargaining representatives of the employees in the appropriate bargaining unit. In the absence of an election and in the absence of evidence that the Stork Club employees wished the unions to represent them, the Stork Club would be guilty of an unfair labor practice if it entered into a contract with the respondent unions. However, the pickets remain and the Stork Club cannot get rid of them, and the consequent impediment to receiving its supplies, unless it is ready to enter into bargaining negotiations with the unions, which have no legal right to bargain for the employees. The unions offer no other way out. It was to meet precisely this situation that the amendments were adopted to the Labor Management Relations Act. As Judge Anderson has recently stated: " * * * The main thrust of this new amendment to the Labor Management Relations Act was to prevent recognition picketing by a union representing a minority of employees or none at all." Greene v. International Typographical Union, D.C. D.Conn., 182 F.Supp. 788.

### Conclusion

■■ The Court concludes that the evidence presented before it was sufficient to demonstrate that there was basis for the Board's finding that the respondents have been engaged in an unfair labor practice in that they are picketing or causing to be picketed, the premises of the Stork Club, and that an object of such picketing is to force or require the Stork Club to recognize or bargain with them as labor organizations and representatives of the employees of the Stork Club; and that such picketing has been conducted without a petition under § 9(c) being filed; and that an effect of such picketing is to induce individuals employed by other persons in the course of their employment not to deliver goods to or perform services at the Stork Club.

The Court concludes that the preliminary injunction sought by the Board should issue, prohibiting the aforesaid picketing.

Submit injunction order in form to comply with Rule 65(d) of the Rules of Civil Procedure, 28 U.S.C.A.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

So ordered.