Ralph E. KENNEDY, Regional Director of the Twenty-first Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

RETAIL CLERKS UNION LOCAL 324 and Retail Clerks Union Local 770, both affiliated with Retail Clerks, International Association, AFL–CIO, Respondents.

No. 471–61.

United States District Court
S. D. California,
Central Division.

May 12, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Daniel J. Harrington, Regional Atty., Region 21, Los Angeles, Cal., Milo V. Price, Walter

N. Moldawer, Attys., N. L. R. B., by Milo V. Price, Washington, D. C., for petitioner.

Sheppard, Mullin, Richter & Hampton, by Frank Simpson III, Los Angeles, Cal., for charging parties Barker Bros. & Gold's Inc.

Gilbert, Nissen & Irvin, by William B. Irvin, Beverly Hills, Cal., for respondent Retail Clerks Union Local 324.

Arnold, Smith & Schwartz, by George L. Arnold, Los Angeles, Cal., for respondent Retail Clerks Union Local 770.

YANKWICH, District Judge.

The Regional Director of the Twenty-first Region of the National Labor Relations Board, pursuant to Section 10($l$) of the National Labor Relations Act as amended (61 Stat. 149; 73 Stat. 544; 29 U.S.C.A. § 160($l$)) (to be referred to as the Act), has filed a petition for a temporary injunction pending the final disposition of a matter pending before the Board. The matter involves a charge jointly filed by Barker Bros. Corporation (hereinafter called Barker's) and Gold's Inc. (hereinafter called Gold's) which alleges that the two respondent unions, to be more specifically designated hereinafter, have engaged in and are engaging in an unfair labor practice within the meaning of Section 8(b) (7), subparagraph (C) of the Act. 29 U.S.C.A. § 158(b) (7) (C).

Specifically it is charged that the two respondent unions have engaged, since on or about February 13, 1961, in prohibited recognitional or representational picketing, an effect of which has been non-delivery by carriers and suppliers to, and their refusal to perform services for Barker's, in violation of the second "proviso" of the Section. This is but an amplification of the "basis of the charge" pending before the Regional Director as set forth in the exhibit attached to the petition, which is reprinted in the margin.[1]

The petition states the Regional Director's conclusion that there is reasonable cause to believe that the respondents have engaged in the unfair labor practice charged and that a complaint of the Board based on the charge should issue.

Respondents, Retail Clerks Union Local 324 (hereinafter called Local 324) and Retail Clerks Union Local 770 (hereinafter called Local 770), both affiliated with Retail Clerks International Association, AFL–CIO, labor organizations, maintain their principal office at Buena Park, California, and Hollywood, California, respectively, and, at all times material herein, have been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee members.

Barker's operates in the Los Angeles, California, area four stores known as Gold's Furniture and Appliances and fourteen stores known as Barker Bros. During the past year Barker's had a gross volume of business in excess of $500,000 and during the same period it

1. "Since on or about February 13, 1961, the above-named labor organization caused various persons to picket, and has engaged in picketing of employers' stores at the following locations: 1207 East Washington Boulevard, Los Angeles; 1201 East Washington Boulevard, Los Angeles; 8252 Van Nuys Boulevard, Panorama City; 5253 Hazelwood, Lakewood; Santa Ana Freeway at Euclid, Anaheim; 4900 Whittier Boulevard, Whittier; 7th and Flower, Los Angeles; 220 South Market Street, Inglewood; 6505 Van Nuys Boulevard, Van Nuys; 18238 Sherman Way, Reseda; 209 Wilshire Boulevard, Santa Monica, where an object of such picketing is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees where such labor organization is not currently certified as the representative of such employees; where such picketing has been conducted without a petition under Section 9(c) being filed within a reasonable period of time from the commencement of such picketing and where an effect of such picketing is, and has been to induce individuals employed by other persons in the course of their employment, not to deliver and transport goods and not to perform services for employers."

received goods, materials and supplies originating outside the State of California valued at in excess of $50,000.

Gold's operates in the Los Angeles, California, area two stores known as Gold's Clothing Co. During the past year Gold's had a gross value of business in excess of $500,000 and during the same period it purchased and received goods, materials and supplies originating outside the State of California valued at in excess of $50,000.

Neither Local 324 nor 770 is currently certified by the Board, pursuant to the provisions of the Act, as the representative of any of Barker's employees. In September, 1960, collective bargaining negotiations commenced between Barker's and representatives of Locals 324 and 770, the subject of which included proposals by representatives of Locals 324 and 770 of collective bargaining agreements covering Gold's furniture stores. These negotiations continued through the month of December, 1960. By letters dated December 20 and 21, 1960, Locals 324 and 770, respectively, demanded negotiation of new contracts covering Gold's employees engaged at work within the geographical jurisdiction of the respective locals. No collective bargaining agreements were ever entered into as a ¬esult of the negotiations.

On or about February 13, 1961, and on various dates thereafter, respondent unions began picketing the various Gold's furniture stores, Barker's furniture stores and Gold's clothing stores. The petition alleged that the picketing had been conducted in furtherance of the unions' demands for recognition and bargaining and in order to compel Barker's employees to accept or select the union as their collective bargaining representative.

■ In a proceeding of this character we determine not the existence or non-existence of the practice alleged in the charge before the Board, but whether the director "has reasonable cause to believe such charge is true." 29 U.S.C.A. § 160(*l*). And see the writer's recent opinion in Kennedy v. Los Angeles Joint Executive Board of Hotel and Restaurant Employees and Bartenders Unions, D.C., 192 F.Supp. 339.

In the case before us we have (1) a charge of unfair labor practice and (2) proof of a preliminary investigation. Left for our determination is the third element, whether there is "reasonable belief induced by the investigation that the charge is true and that an injunction should issue". LeBaron v. Los Angeles Building & Construction Trades Council, D.C.Cal.1949, 84 F.Supp. 629, 634.

The Section, violation of which is charged in the petition, (29 U.S.C.A. § 158(b) (7) (C)), proscribes, in its first proviso, certain types of recognitional and organizational picketing for longer than a thirty-day period where the union is not certified and has not, within the thirty-day period, applied for such certification. It is undisputed that neither union, at the present time, is certified or seeks such certification.

■ Neither union has ever had or sought representation in the stores designated as Barker's. Collective bargaining agreements with the Gold's stores existed before the Barker's stores were acquired late in 1960. As of December 20, 1960, the unions, in separate communications, addressed to Charles A. Gold, Executive Vice President of the Gold's stores, stated that they represented a majority of the retail clerks in what is known as the textile branch, namely furniture and hard goods. After some abortive discussions Gold sent to the unions identical letters, dated January 10, 1961, which, among other things, stated:

"Approximately a year has elapsed since the expiration of our last contract and we have no current knowledge as to whether a majority or any of our employees in any appropriate unit desire to continue to have your union represent them. Under the circumstances, we cannot extend further recognition to you as such representative unless and until you

have been certified as such representative by the National Labor Relations Board in an appropriate unit."

Under date of February 13, 1961, each of the unions replied stating that they *no longer* claimed to represent a majority of the employees within their jurisdictions. The letters contained this identical paragraph:

"Because of the prolonged delays in the numerous negotiating meetings, totaling 14 in all, from September 14, 1960 to December 15, 1960, which, in our opinion, indicated that the employer was bargaining in bad faith, you have succeeded in alienating our former members to such an extent that we now withdraw our claim for recognition and any and all demands that you enter into a collective bargaining agreement with us."

While each union is a separate entity, they follow, as members of the same International Association, the same practices within their respective jurisdictions. Concededly, each knew what the other was doing. And as they were seeking the same objective, it was natural that they follow the same pattern.

Parallelism of action in the economic field is recognized by social scientists as a fact. Those dealing with the same problems may adopt the same measures without preconcerted agreement. *Fanchon & Marco v. Paramount Pictures, Inc.*, D.C.Cal.1951, 100 F.Supp. 84, 104, footnote 41; *United States v. Twentieth Century-Fox Film Corporation*, D.C.Cal. 1955, 137 F.Supp. 78, 115.

The picketing began right after the letter was sent. It has continued to the present time. The legends on the signs carried by the pickets on behalf of Local 770 were, in substance:

"Gold's
Barker Bros.
Non-Union
Please Do Not
Patronize
Retail Clerks Union
Local 770 AFL–CIO"

and

"Attention
Public Only
Gold's—Barker Bros.
Employee Unfairly
Discharged
Please Do Not
Patronize
Retail Clerks Union
Local 770 AFL–CIO"

The legends on the signs carried by the pickets on behalf of Local 324 were, in substance:

"This Is To Inform The Public That
Gold's
Barker Bros.
Does Not Have A
Contract With
Retail Clerks Union
Local 324 AFL–CIO
Please
Do Not Patronize"

Because Gold's had a contract with certain other trade unions, the unions were careful to notify such unions and their internationals that the purpose of the picketing was not "to stop deliveries".

The handbills distributed by the pickets, which were made available to employees, stated clearly that the appeal was to the public "not to patronize". The title of one of them is typical:

"Please
Do Not Shop
At
Gold's
Barker Bros.
They are Non-union
Buy At Union Stores
Retail Clerks Union
Local 770 AFL–CIO
(Emblem of
Shop Where You     Retail Clerks
See This Sign       International
Association)

There are *fair* stores in this community that display this sign * * * It means their employees enjoy good conditions and the stores merit your support."

After the picketing began, Local 770 sought to place with five daily newspapers in the Los Angeles Metropolitan area advertisements which stressed the fact that the picketing merely sought to appeal to the public "not to patronize". Only two newspapers accepted them. The one published in the Los Angeles Times read:

"[Times April 24, 1961].
Attention
Labor Organizations
And General Public

"A picket line has been established by the Retail Clerks Unions of Southern California on Gold's and Barker's furniture stores.

"This picket line is *only* for the purpose of advertising that Gold's and Barker's are non-union.

"This advertisement is to serve notice to all labor organizations that we are not seeking to interrupt deliveries or service at the Gold's and Barker's stores, and are not soliciting their support for this purpose.

"We are only exercising our constitutional right to free speech by asking the public not to patronize Gold's and Barker's non-union stores
"Joseph T. De Silva
"Secretary-Treasurer
"Retail Clerks Union Local 770,
AFL–CIO"

The one published by the Citizen-News read:

"[Saturday April 29, 1961   The Citizen-News]

"Please Understand
Our Position   *   *   *

"Retail Clerks pickets are at Gold's and Barker's Furniture Stores

"In this way and through advertising, we have been able to inform the public that Gold's and Barker's are non-union in their retail operation. When we have referred to 'non-union,' we have meant specifically those in the store who come within Retail Clerks jurisdiction.

"This company employs non-selling personnel who are represented by the Teamsters and Building Service

Unions under collective bargaining. We are not seeking to stop deliveries or services.   The pickets are informational. ·

"We are exercising our constitutional rights to advise the public of the fact that sales employees of Gold's and Barker's (they are one company) are non-union.

"Retail Clerks Union Local 770
"AFL–CIO
"Joseph T. DeSilva, Exec. Secy."

■   It is significant that after the disclaimer of February 13, 1961, the employer was *never* approached with any request for renewing negotiations that might lead to recognition or representation.   On the contrary, the unions *resisted* all attempts at negotiations.   It is true that in matters of this character

"it was sufficient that an objective of the picketing, although *not necessarily the only* objective of the picketing" (International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 1951, 341 U.S. 694, 700, 71 S.Ct. 954, 957, 95 L.Ed. 1299) (emphasis added)

be proscribed.   See, Department and Specialty Store Employees' Union, etc. v. Brown, 9 Cir., 1961, 284 F.2d 619, 628. But, as appears from what precedes and will be made more evident in the discussion to follow, the pattern outlined is thoroughly consistent throughout.

■   This is not a case where the facts so palpably contradict expressed intention that they should be given primacy.   See, McLeod v. Chefs, Cooks, Pastry Cooks and Assistants, Local 89, D.C.N.Y.1960, 181 F.Supp. 742, 746–748; Kennedy v. Los Angeles Joint Executive Board of Hotel and Restaurant Employees and Bartenders Unions, supra.   To the contrary, here the facts coincide with the contemporaneously expressed intent to limit the picketing to a small but legitimate area, namely, appeal to the public, —of whom labor union members and their families and sympathizers are a part,—not "to patronize" merchants who, in their business or in some department of their business, do not employ un-

ion men. This area is defined in the second or "unless" proviso to the Section of the Act which is involved here and which reads:

"That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services." § 8(b) (7) (C), 29 U.S. C.A. § 158(b) (7) (C).

The Supreme Court has told us definitely the meaning of this proviso,— added by the Labor Management Report and Disclosure Act of 1959,—in these words:

"That Act goes beyond the Taft-Hartley Act to legislate a comprehensive code governing organizational strikes and picketing and draws no distinction between 'organizational' and 'recognitional' picketing. While proscribing peaceful organizational strikes in many situations, it also establishes safeguards against the Board's interference with *legitimate picketing activity*. See § 8(b) (7) (C). Were § 8(b) (1) (A) to have the sweep contended for by the Board, *the Board might proceed against peaceful picketing in disregard of these safeguards*." National Labor Relations Board v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 1960, 362 U.S. 274, 291, 80 S.Ct. 706, 716, 4 L.Ed.2d 710. (Emphasis added.)

This clause immunizes picketing if its purpose is

"truthfully to inform the public that the employer does not have a contract with the union and further if the picketing does not curtail picking up, delivery or transportation of goods or the performance of services." Getreu v. Bartenders and Hotel and Restaurant Employees Union, D.C.N.D.Ind.1960, 181 F.Supp. 738, 741.

It may be true that picketing

"is more than speech and establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey." Building Service Employees International Union, Local 262 v. Gazzam, 1950, 339 U.S. 532, 537, 70 S.Ct. 784, 787, 94 L.Ed. 1045.

Concededly also, picketing is

"the customary means of enlisting the support of employees to bring economic pressure to bear on their employer." International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, supra, 341 U.S. at page 703, 71 S.Ct. at page 959.

But these acts must be considered in the context of the exercise of certain guaranteed fundamental rights and should not be denied

"merely because there may have been isolated incidents of abuse falling far short of violence occurring in the course of that picketing." Cafeteria Employees Union, Local 302 v. Angelos, 1943, 320 U.S. 293, 296, 64 S.Ct. 126, 127, 88 L.Ed. 58.

And see, Madden v. International Hod Carriers', Building and Common Laborers' Union of America, 7 Cir., 1960, 277 F.2d 688, 692–693.

■ Admittedly, the unions circulated among the employees cards requesting affiliation with the union.[2] This was an

2. The cards printed on a regular "Business Reply Card" read:
"Retail Clerks International Association (AFL–CIO)
"5955 Hollywood Blvd. Hollywood 28, Calif. HOllywood 2–6111

"Authorization for Representation
"I, the undersigned, employee of the —————————————
Employed as ————————Dept.————
        Job Title
hereby authorize Retail Clerks Interna-

ordinary union activity. It was not related to the picketing. The fact that the two activities were carried on simultaneously does not of necessity, tie them into a concerted action to achieve a forbidden result. No law prohibits a union from soliciting membership. The Act guarantees employees the right

"to form, join, or assist labor organizations." Act, § 7, 29 U.S.C.A. § 157.

And the union, Local 770, had the right to protest and call to the attention of the Labor Board the fact that, in its opinion, an employee, Gerald D. Dargert, was unlawfully discharged by reason of union activity.[3] This charged an unfair labor practice by the employer forbidden by the Act. Act, § 8(a) (3), 29 U.S.C.A. § 158 (a) (3).

There is no showing in the record that this incident, indicating *merely* willingness on the part of the union to help protect the rights of an employee, resulted in any nondelivery by carriers and suppliers at the picketed places. Nor can this statement of the benefit of unionism be turned into an unauthorized recognitional or representational appeal in violation of the section complained of in this case. 29 U.S.C.A. § 158(b) (7) (C).

As to the alleged interruption of deliveries, the conclusion is inescapable that there were none that could be traced directly to the acts of the men on the picket line or either union. It is true that in five instances truck drivers testified that upon seeing the picket line they declined to deliver materials, but in each instance the material was delivered later, after the driver had checked with his union that deliveries were not to be interfered with. No picket lines were stationed at the delivery entrance of any of the stores and no pickets were stationed in the early hours of the morning when deliveries are made. None of the pickets told anyone, either by word of mouth or otherwise, that they could not or should not cross the picket line. Indeed, one of the drivers testified that, upon seeing the picket line, without even stopping the car,

---

tional Association, AFL–CIO to represent me for the purposes of collective bargaining, respecting rates of pay, wages, hours of employment, or other conditions of employment, in accordance with applicable law.

Name———— Phone———— Date———

Home address   City   Employee's signature"

The reverse side contained the address of the Retail Clerks Union, the usual postal notations making postage unnecessary and the printed legend "Union Security Is Job Security".

3. Additional facts in the record relating to this incident are:
On the back of one of the handbills the following notice appeared:

"Attention! Public Only!
Golds-Barker Employee
Unfairly Discharged
The Matter Has Been Submitted
To The
National Labor Relations Board
Please Do Not Patronize
Retail Clerks Union, Local 770
AFL–CIO"

In a typed leaflet addressed to "All employees of Golds-Barker Bros.", which was distributed to employees on March 19, 1961, and also placed, on one occasion, on the desk of the manager of the Glendale Barker's Store, Local 770 makes the statement:

"All Employees under the laws of the United States have a right to become Union members and to persuade others to seek Union representation. Mr. Dargert has been unlawfully terminated by the company for doing what he has a right to do under law."

This is coupled with the assertion that the union has taken the matter to the National Labor Relations Board and that it had appealed the matter to General Counsel after the Los Angeles Office had dismissed the charge. The leaflet ended with the statement:

"Local 770 will do its utmost to preserve the rights of this employee."

The appeal was denied on May 4, 1961. For the reason indicated in the text, this incident has no significant bearing upon the issue before us. However, we have treated it fully and gone into many details because the Director and the charging party seem to have attached to it a meaning which, in our view, is not borne out by the circumstances surrounding its preparation and circulation.

he, *as a matter of principle,* took his load back, only to deliver it later when he found that delivery could be made.

When a truck driver carrying a large roll of carpet, originating out of the state, declined to cross the picket line, the problem was solved by having the delivery made at the company warehouse.

On one occasion persons cleaning windows at one of the stores, hesitating to cross the picket line, completed the cleaning by merely changing their position to sides of the building where there were no pickets or completing the others when the pickets were gone. So, these isolated incidents stemmed from the subjective feelings of persons not responsible to the unions before us. They were not an "effect" of what was done on the picket line. They should not, therefore, be charged to the unions or be applied prospectively.

In sum, we cannot charge the union with the effect of the picketing upon deliveries by carriers and suppliers or the refusal to perform services, if such there were, unless *there is causal connection* between the stoppage and the acts of the pickets. If we charge them to the picketing merely because they may have happened, we fall into the sophistry which we are taught in logic to avoid, *Post hoc ergo propter hoc* (After it, therefore, caused by it). Bad as logic, it would be even worse ethics to hold one responsible for the acts of others, which *he did not effect.*

Grant that our function is not to determine the truth of the charge made in the proceedings before the Board, nevertheless, in the light of what has been said, a finding that reasonable cause exists would not be warranted in the circumstances. For the credible evidence in the case warrants the conclusion that we have here the exercise of the undeniable and guaranteed right of unions to appeal to the public (including consumers) not to patronize, i. e., clearly a case of legitimate picketing. See, Brown, etc. v. Department & Specialty Store Employees Union, D.C.1960, 187 F.Supp. 619, 624–625; Department and Specialty Store Employees' Union, etc. v. Brown, 9 Cir., 1960, 284 F.2d 619, 626.[4]

The denial of the injunction will not, of course, affect or interfere with the Board's final determination of the charge before it, in aid of which injunction is sought.

The petition for injunction under Section 10(*l*) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160 (*l*)), is denied. Findings and judgment to be prepared by counsel for the defendants under local Rule 7, West's Ann.Code.

4. There are other facts in the record which, in the interest of reasonable brevity, have been omitted, which serve to confirm this conclusion. In reaching it we have considered the contention of the Regional Director of the Board that the second or "unless" proviso of the Section does not afford protection, if "an effect" of "picketing has been to induce individuals employed by other persons not to pick up or deliver goods".

Conceding that effect means "actual" effect there must be, as stated in the text, causal connection between the effect and the picketing. If, as the preceding discussion shows, there is no such connection between the so-called delays in delivery and any acts of the pickets, or the respondent unions, and we nevertheless attribute them to the picket line, we would destroy the "safeguards against * * * interference with legitimate picketing activity." National Labor Relations

Board v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 1960, 362 U.S. 274, 291, 80 S.Ct. 706, 716, 4 L.Ed.2d 710. Grant that the Congress might proscribe all picketing in furtherance of certain "unlawful objectives" (International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 1951, 341 U.S. 694, 705, 71 S.Ct. 954, 95 L. Ed. 1299. See, Douds v. Local 1250, Retail Wholesale Department Store Union of America, 2 Cir., 1948, 170 F.2d 700, 701) nevertheless, the fact is that by this second ("unless") proviso the Congress has *immunized* certain types of picketing. We should not destroy that immunization by an interpretation which disregards its scope, as defined by the Supreme Court. National Labor Relations Board v. Drivers, Chauffeurs, Helpers, Local Union No. 639, supra this note.