328 F.2d 431
 BARKER BROTHERS CORPORATION and Gold's Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Retail Clerks Union, Local 770 and Retail Clerks Union,
Local 324, Intervenors.
 No. 18303.
 United States Court of Appeals Ninth Circuit.
 Feb. 20, 1964.
 
 Sheppard, Mullin, Richter & Hampton and Frank Simpson, III, Los Angeles, Cal., for petitioners.
 Gilbert, Nissen & Irving, Beverly Hills, Cal,. for intervenor Retail Clerks Union, Local 324.
 Arnold, Smith & Schwartz, George L. Arnold, Kenneth M. Schwartz, and Laurence D. Steinsapir, Los Angeles, Cal., for intervenor Retail Clerks Union, Local 770.
 Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Norton J. Come, Asst. General Counsel, James C. Paras and Lee M. Modjeska, Attys., N.L.R.B., Washington, D.C., for respondent.
 Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.
 DUNIWAY, Circuit Judge.
 
 
 1
 Petition to review an order of the National Labor Relations Board dismissing a complaint instituted by the petitioners. The Board's 3 to 2 decision is reported at 138 N.L.R.B. 478. We conclude that the petition should be denied.
 
 
 2
 Barker Brothers Corporation and Gold's Inc. charged that respondents, Retail Clerks' Union, Local 324, and Retail Clerks' Union, Local 770, were engaging in unfair labor practices in violation of section 8(b)(7)(C) of the Labor-Management Relations Act as amended (29 U.S.C. 158(b)(7)(C)). The regional director for the Board had filed an action in the United States District Court for the Southern District of California seeking a temporary injunction, pursuant to section 10(l) of the Act (29 U.S.C. 160(l). The decision of the district court, denying the injunction, is reported in Kennedy on Behalf of N.L.R.B. v. Retail Clerks' Union, Local 324, 1961, 194 F.Supp. 131. The present proceeding was presented to the Board under a stipulation whereby the parties waived a hearing before the trial examiner and the issuance of an intermediate report and recommendation by the trial examiner, and submitted the matter directly to the Board upon the record made in the district court action.
 
 
 3
 It appears from the Board's findings that Barker Brothers Corporation, one of the petitioners, operates 20 retail furniture and appliance stores in Los Angeles, California and in surrounding communities, 4 being operated under the name Gold's Furniture and Appliances and the other 16 under the name Barker Brothers. Gold's Inc., the other petitioner, which is owned by the same interests, operates 2 retail clothing establishments known as Gold's Clothing Co. Stores. The unions are not the certified bargaining representatives of the employees of either petitioner. Each local, however, had previously represented employees of the four Gold's Furniture and Appliance Stores. Following considerable negotiations for new contracts, the unions began to picket the petitioners' stores. The principal signs carried by the pickets of Local 770 read as follows: 'Gold's Barker Bros. Non-union. Please do not patronize. Retail Clerks' Union 770, AFL-CIO.' Those carried by pickets for Local 324 read: 'This is to inform the public that Gold's Barker Bros. does not have a contract with Retail Clerks' Union, Local 324, AFL-CIO. Please do not patronize.' Handbills were distributed by the pickets which stated: 'Please patronize union stroes. Please do not shop at Gold's Barker Bros. It is not a union store.' The picketing was generally confined to consumer entrances to the stores and was conducted only during those hours when the stores were open to the public.
 
 
 4
 The unions, at the time the picketing began, sent telegrams to the Teamsters' Union indicating where the picket lines were being established and requesting that the Teamsters' locals be advised that the purpose was not to stop deliveries. Local 770 placed advertisements in local newspapers advising the public that the purpose of the picket lines was onlyn to advise that Barker Brothers and Gold's were non-union in their selling operations, and urging labor organizations not to stop deliveries or services at the stores. The pickets themselves were instructed not to picket at delivery entrances and not to interfere with the public or with the drivers making deliveries. The Board found, and the record supports the finding, that these instructions to the pickets were complied with.
 
 
 5
 The petitioners presented evidence to show that deliveries and the rendering of services were interrupted. Some of this evidence was direct testimony by participants. Some of it was second or third hand hearsay. The Board's findings on this subject, which we find to be supported by the evidence, read as follows:
 
 
 6
 'Notwithstanding the Respondent Unions' efforts to prevent nondeliveries and work stoppages, the record discloses that 3 truckdrivers employed by employers, not parties to the proceeding, each refused to deliver one shipment of merchandise. Other deliveries of merchandise were delayed on at least 3 occasions (in part due to the refusal of truckdrivers to cross the picket lines until their respective union organizatins and/or employers authorized them to do so), and there was a few hours delay in the performance of window cleaning and window glazing services by employees of concerns engaged in furnishing such services for the Barker Stores.'
 
 
 7
 The Board also found that an object of the picketing was recognition, thus bringing the picketing within the general ban of section 8(b)(7)(C). It further found that the purpose of the picketing was truthfully to advise the public that the petitioners did not employ memebers of, or have a contract with, the picketing unions. It concluded that the picketing was truthful and that those interruptions of deliveries and services that did occur did not disrupt, interfere with or curtail the petitioners' business, and that therefore section 8(b)(7)(C) was not violated.
 
 
 8
 The petitioners present three questions. The first is whether picketing for the purpose and of the type described in the second proviso to section 8(b)(7) (C) is nevertheless unlawful if it has as an object forcing or requiring an employer to recognize or bargain with a labor organizatin. This question we have decided adversely to petitioners' contention in the case of Smitley v. N.L.R.B., 9 Cir., 327 F.2d 351, 1964, and we therefore do not repeat out discussion of the question here.
 
 
 9
 Petitioners next contend that the picketing was not truthful. This contention applies only to Local 770 and is based upon the admitted fact that petitioners did have union contracts for certain non-selling personnel, namely, Teamsters' Local 598 for truckdrivers and the Service and Maintenance Union for maintenance employees. As to this, the Board said:
 
 
 10
 'The record indicates that Barker and Gold's non-selling personnel, at least in part, were represented by labor organizations other than the Respondents. Despite this fact, some of the picket signs indicated in general terms that Barker Bros. and Gold's were 'non-union' without expressly limiting the application of that statement to the employees of those employers engaged in selling operations. Nevertheless, it is clear from the language of the picket signs themselves that they only intended to convey the information that Barker and Gold's had no contract with the Retail Clerks and that those Employers were nonunion with respect to them. It is unreasonable to expect hat, as suggested by our dissenting colleagues, a union involved in a recognitional and bargaining dispute with an employer and concerned with its own problems should be required to assume the burden of informing the public that the employer may or does have a contract or contracts with other unions. Moreover, there is absolutely no evidence to indicate that the failure to draft the picket language in more limited terms was based upon an intent to deceive the public. Nor is there any evidence to indicate that the public was in fact deceived by the picket signs.'
 
 
 11
 We agree. The signs upon which petitioners rely and which are quoted above juxtaposed the statement that petitioners were non-union with the name of the picketing union, and we think that this language would indicate to the average person reading the sign that the stores were non-union so far as retail clerks were concerned. This is a form of short-hand statement that has long been used by union pickets and we do not think that the statute requires the kind of literalism for which petitioners contend.
 
 
 12
 Petitioners' principal reliance is upon the 'unless' clause of the second proviso to subparagraph (C) of section 8(b)(7). That proviso reads as follows:
 
 
 13
 'Provided further, That nothing in this subparagraph (C) shall be construed to prohibit and picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.'
 
 
 14
 Petitioners say that the interruptions of deliveries that occurred and the delays in rendering services that occurred fall within the literal language of the clause, which they emphasize as folloes: (Unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.' Basically, their position is that if one delivery man is induced to fail to make one delivery, the 'unless' clause operates and the picket line is illegal. This is a possible reading of the language, but it could produce bizarre results. For example, the evidence in this case shows that on one occasion, at one of the many stores involved, a glazier refused, for a total period of 45 minutes, to install a 16' X 22' pane of glass. We find it hard to believe that it was intended that such an occurrence would make the picketing illegal. If that was the intent, then those members of the Congress who fought for the inclusion of the quoted proviso achieved an empty victory.
 
 
 15
 But we do not think that the language is so clear as petitioners say it is. They interpret the words 'any goods' and 'any services' to mean one item of goods and one bit of service. Another possible, and we think, equally reasonable interpretation of the language on its face could be that the proviso does not apply unless the effect of the picketing is to induce an individual 'not to pick up, deliver or transport any goods' at all, in other words, a total refusal to deliver while the picket line is there. The same, of course, would apply to the language referring to 'any services.' There is no evidence whatever that would support a finding that anyone was so induced. We think that this suggested meaning is about as bizarre a reading of the statute as is petitioners'.
 
 
 16
 It is also arguable that the word 'induce' has a different meaning from 'cause.' Thus, if a driver bringing goods to one of petitioners' stores sees a picket line and, solely because he personally objects to crossing any picket line, fails to make a delivery, it can be said that the picket line caused the failure to deliver. Can it equally well be said that the picket line induced the failure to deliver? This word carries with it an element of persuasion and would seem to require the doing of something by the pickets, either through written or oral communication, to persuade the driver not to deliver. There is also a practical problem if this approach is used. In each case the Board would then have to prove such actual persuasion, which might be difficult, even in a case where the employer's business was practically shut down because drivers and service men refused to cross the picket Line. In short, we feel that we must reject the petitioners' contentions that the literal language of the 'unless' clause is so clear that we are compelled to reverse the Board's decision. The Board, then, was in a position where it had to find, if it could, a meaning that will, as nearly as possible, accomplish two results, namely, permit 'informational' picketing, as the second proviso to subparagraph (C) was designed to do, while at the same time outlawing it if it had the 'signal' effect of stopping deliveries and services, at which the 'unless' caluse is aimed.
 
 
 17
 The Board carefully analyzed the purpose of the 'unless' clause and we agree with its analysis, which is as follows:
 
 
 18
 'Before turning our attention to a discussion of the crucial 'effect' clause, upon which the ultimate outcome of the instant case depends, it would be worthwhile to reflect more fully on the informational picketing proviso to subparagraph (C). For a reasoned construction of the statute requires an appreciation of the interplay between those two provisions and thus dictates against reading the 'effect' clause in a vacuum.
 
 
 19
 'The informational picketing proviso, in a word, immunizes certain picketing from the proscription of Section 8(b)(7)(C) unless and until the circumstances explicated in the effect clause come into play. It is clear that Congress, in enacting this proviso, was doing no more, or perhpas more aptly no less, than placing its stamp of approval on what it envisaged as the constitutional right of labor organizations to freely disseminate certain information to the public through peaceful picketing. Nor can the historic significance of this fundamental right be overemphasized. For not only has peaceful picketing long been described as 'the workingman's means of communication,' but it also has traditionally been regarded by the Supreme Court, at least in part, as an exercise of the constitutional right to free discussion which should therefore be 'guarded with a jealous dye.' That the Congress wished to accord informational picketing a similarly privileged status is attested to by the legislative history and the very language of the proviso itself. On the other hand, the effect clause stands as a testimonial to the fact that freedom to communicate by peaceful picketing is not an absolute right in the eyes of Congress. As so frequently is the case in the highly complex area of labor-management relations, our task thus becomes one of striking a delicate balance between two conflicting interests-- labor's desire to freely communicate its ideas to the public through picketing and management's desire to be insulated from the coercive effect thereof.
 
 
 20
 'We believe that in exempting informational picketing from the proscription of the Act, Congress intended to exempt picketing which was directed at persuading the public in the immediate vicinity of the primary employer's place of business and that Congress recognized that the information conveyed by such picketing, at least where retail stores were involved, would be received by two classes of the public, as well as by the employees of the picketed employer, i.e., prospective customers and suppliers about to make deliveries and/or[1] to perform services. The effect of the picketing upon the prospective customer, if successful in turning him away, is a basic economic pressure against the employer which has an impact on his operation to the extent that he loses the business of the consumer. On the other hand, the effect upon suppliers might be to keep them from completing deliveries or performing services for the employer. This also results in a basic econimic pressure against the employer to the extent that it has coercive impact on his business operation. Construing the information proviso and the effect clause, it seems clear that picketing which exerts the former type of economic pressure had Congressional approval, but picketing which fosters the latter was proscribed, at least where it persists beyond a reasonable period not to exceed 30 days.'
 
 
 21
 'To read the effect clause literally[2] would, for all practical purposes, render illusory the very protection which the Congress expressly conferred upon labor's right to disseminate information to the public by engaging in publicity picketing. It might thereby not only bring into play a serious constitutional question, but also do a disservice to the Congress itself. Suppose, for example, a strong-willed deliveryman with an antipathy to crossing any picket line (regardless of the sector of the public to whom it was designed to appeal) refused to cross, notwithstanding his own union's instructions to do so and the affirmative request of the picket himself. (1) What result? (2) In such circumstances and absent any other evidence concerning the effect of the picket line, would it not be anomalous to make an unfair labor practice finding? (3) Should the right of a labor organization to bring its cause to the public's attention rest on so tenuous a base as an individual truckdriver's exercise of a personal prerogative?
 
 
 22
 'Anticipating that such problems were destined to arise, Archibald Cox and Benjamin Aaron, among others, two noted legal scholars in the field of labor-management relations, took the position that the effect clause should not be invoked to prohibit informational picketing merely on the basis of a few isolated instances of drivers refusing to cross the line.[3]
 
 
 23
 'However, a different result would be dictated were the evidence to demonstrate that the failure of one or more supplir's truckdrivers to make a delivery interfered with, disrupted, or curtailed the picketed employer's operation. In our opinion, this is the type of economic pressure, at least with respect to employers operating retail establishments, from which Congress sought to immunize the employer.
 
 
 24
 'Thus, it is readily apparent that a quantitive test concerning itself solely with the number of deliveries not made and/or services not performed is an inadequate yardstick for determining whether to remove informational picketing from the proviso's protective ambit. Rather, with respect to employers operating retail establishments, we believe that where delivery and/or work stoppages occur, it would be more reasonable to frame the test in terms of the actual impact on the picketed employer's business. That is, the presence or absence of a violation will depend upon whether the picketing has disrupted, interfered with, or curtailed the employer's business. Naturally, this is a question of fact which can only be resolved by the Board in light of all the circumstances in each case. Moreover, we believe, contrary to our dissenting colleagues, that once the respondent, as here, demonstrates that it is engaging in informational picketing, it then becomes incumbent upon the General Counsel, as part of his statutory obligation to establish by a preponderance of the evidence the commission of an unfair labor practice, to present evidence that the picketing did in fact interfere with, disrupt, or curtail the employer's business.
 
 
 25
 'The evidence adduced in the instant case reveals that the picketing was carried out over a 12-week period; that approximately 18 of the employer's stores were picketed; that the union took active measures, described more fully, supra, to ensure that there would be no interruption in the employer's pickups and deliveries; and that during this extensive period of time in which the picketing was conducted there were only three delivery stoppages, two work delays, and several delivery delays. In addition, the record is virtually silent as to not only the nature and quantity of the products that failed to reach their destination but also the impact of the stoppages and/or delays on the employer's business.
 
 
 26
 'On the basis of all the foregoing, we can not find that the Respondents' informational picketing constituted 'an effect' within the meaning of Section 8(b)(7)(C). We find, therefore, that in the absence of 'an effect' attributable to the informational picketing, Section 8(b)(7)(C) is not violated. Accordingly, we shall dismiss the complaint herein.'
 
 
 27
 As in Smitley v. N.L.R.B., supra, petitioners urge that legislative history requires a contrary result. The history is discussed at some length in the majority and minority opinions of the Board and we, too, have considered it. We find it equivocal. We agree with the Board majority, that the construction given by it to the 'unless' caluse comes closer to accomplishing the results that the Congress probably sought to achieve than any other construction that has been suggested to us. There is a fundamental weakness in much legislative history, particularly in floor debates, on which both parties rely, which is clearly apparent here. It is made by a comparatively small number of the members of each house, and primarily by those who are actively promoting clashing points of view. It gives no weight to the views of the large majority, who made no speeches, but voted. The statute we are construing was the result of a hard fought compromise. Many of those who spoke show the usual tendency of an advocate to seize upon a particular word or phrase as proof that the bill means what they think it ought to mean. Where the bill, as passed, is a product of compromise, we think it likely that a construction that falls somewhat between these partisan views is more likely to accord with the wishes of the Congress as a whole.
 
 
 28
 We remember, too, that we are reviewing the decision of the body to whose expert competence the Congress has entrusted the task of applying the statute to the varied and often unforeseeable situations to which it must be applied. We find its construction, in the context of this case, reasonable, and we approve it.
 
 
 29
 The petition is denied.
 
 
 30
 BARNES, Circuit Judge (concurring in part and dissenting in part):
 
 
 31
 I agree with the majority opinion except in one respect, wherein it agrees with the Board majority that the wording of the signs and handbills of Local 770 adequately satisfied the 'truth' requirement of 8(b)(7)(C). I do not believe that the Board could conclude from the record that the 'purpose' of Local 770 was of 'truthfully advising the public.'
 
 The Board majority claimed:
 
 32
 'There is absolutely no evidence to indicate that the failure to draft the picket language in more limited terms was based upon an intent to deceive the public.' 138 N.L.R.B. 478, 486, n. 15.
 
 
 33
 However, the union was required to change the wording in its newspaper advertising layout in order to obtain newspaper space. Thereafter, it did not change the wording of its signs and handbills. The union's unwillingness to the wording of its signs and handbills after this occurrence readily leads me to conclude that the union did intend to deceive the public. This is a purpose other than that required in 8(b)(7)(C).
 
 The Board argued:
 
 34
 'It is unreasonable to expect that, as suggested by our dissenting colleagues, a union involved in a recognitional and bargaining dispute with an employer and concerned with its own problems should be required to assume the burden of informing the public that the employer may or does have a contract or contracts with other unions.' 138 N.L.R.B. 478, 486, n. 15.
 
 
 35
 Such a burden does not seem unreasonable to me. I think that was what the Congress intended. The statute imposes the burden of giving only truthful advice. The union could easily avoid the problem by wording its signs and handbills as Local 324 did. It is not too much, to my mind, to burden the union with stating the truth; no more, and no less, rather than a half-truth where, as here, it knows that the employer has union contracts with other unions. I agree with the following comment of the Board minority:
 
 
 36
 'If the statutory requirement that the publicity must be truthful is to have any meaning, Respondents must be the insurer of accuracy to the extent that they know the facts.' 138 N.L.R.B. 494, n. 45.
 
 
 37
 The majority opinion here accurately observes that the phrase 'non-union' is a form of shorthand statement that has long been used by union pickets. Yet, that observation does not meet the issue here, which is the effect on picketing of this new legislation. One purpose was, I believe, to insure accurate 'shorthand.'
 
 
 38
 The majority here believes, and the Board majority opinion implies, that the language of the signs and handbills would indicate to the average man that the store was non-union only as to retail clerks. I would not say this is an unreasonable conclusion (even though I would not make it), where, as here, the union name with a reference to 'retail clerks' appears at the bottom of the signs and handbills. However, I do not see whyu it is any less reasonable to conclude that a substantial number of persons, even a substantial minority of non-union members, would consider the words 'non-union' to mean that the employer had no union contracts whatsoever. If it is foreseeable to the union that a substantial number of persons would be deceived, I believe the requirement of 'truthfully advising the public' is not satisfied. The union's purpose here was more than to truthfully advise. It was to intentionally hope that at least a substantial minority of the public would be deceived. There might, and probably would, always be someone who would be deceived, so de minimis possibilities of deception should not require a conclusion that the union's purpose was other than to truthfully advise the public. But if, as here, it is probable that a substantial number of persons would be deceived, and if the union knows this yet does nothing to change the wording of its signs and handbills, I belive we must conclude that the union's purpose was one other than of 'truthfully advising the public.'
 
 
 39
 If such a conclusion were reached, the question of an appropriate remedy would then arise. However, since the majority here need not reach that issue, I do not.
 
 
 
 [1]
 Our quotation of the Board does not indicate approval of its use of this expression, if such it can be termed
 
 
 [2]
 This refers to petitioners' 'literal' reading, a reading which, as we have already indicated, is not so literal as petitioners say it is
 
 
 [3]
 Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 267; Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086, 1107 (1960)