**LOCAL 901, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent, Appellant,**

**Raymond J. COMPTON, Regional Director, Etc., Petitioner, Appellee.**

**No. 5771.**

United States Court of Appeals
First Circuit.
June 15, 1961.

George L. Weasler, Santurce, P. R., for appellant.

Winthrop A. Johns, Asst. Gen. Counsel, Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and James T. Youngblood, Atty., Washington, D. C., were on brief, for appellee.

Before WOODBURY, Chief Judge, and MAGRUDER* and HARTIGAN, Circuit Judges.

WOODBURY, Chief Judge.

Editorial El Imparcial, Inc., a Puerto Rican corporation, filed an amended charge with the appellee-Regional Director alleging that the appellant-Union had engaged in and was engaging in unfair labor practices in violation of the secondary boycott provisions embodied in § 8 (b) (4) (i) (ii) (B) of the Labor Management Relations Act, 1947, as amended by § 704 of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 542, 543, quoted in the margin.[1] The appellee-Director, after investigation concluded that there was reasonable cause to believe that the appellant-Union had engaged in the unfair labor practices alleged in the amended charge and that a complaint should issue. He therefore, on behalf of the Board, filed a petition in the court below under § 10(*l*) of the Act asking for injunctive relief pending the final adjudication of the matter by the Board. The appellant-Union answered with a general denial and affirmative defenses, and after hearing the court below made findings of fact on the basis of which it entered the order granting in-

---

* Sitting by designation.

1. "8(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"4(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \*

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \*." 29 U.S.C.A. § 158(b) (4) (i, ii) (B).

junctive relief from which the Union has taken this appeal.

The facts are as follows. Editorial El Imparcial, Inc., has for many years been engaged in San Juan, Puerto Rico, in the business of publishing a Spanish language daily newspaper called "El Imparcial." Its offices and plant are located in a building owned and operated by another corporation in which in October, 1959, Star Publishing Company, Inc., a Puerto Rican corporation, leased space for use in publishing a daily English language newspaper called "The San Juan Star." Just prior to commencing publication in November, 1959, Star entered into a one-year contract with El Imparcial under which El Imparcial agreed to print the "San Juan Star" on its presses from mats supplied by Star. Under this contract Star set the type for its newspaper in its own composing room, did its own engraving and prepared its own mats which it took down to El Imparcial's press room. At that point El Imparcial employees took over, cast the plates, put them in the presses and ran off the paper on Star's newsprint. Star employees received the printed papers in El Imparcial's mail room where they were bundled partly by Star's men for distribution by Star employees.[2] Aside from the printing contract there was no relationship whatever between Star and El Imparcial. Both newspapers subscribe to national news services, advertise products imported into Puerto Rico for sale and annually receive substantial amounts of goods and materials, obviously including their newsprint, from outside Puerto Rico.

In consequence of a labor dispute El Imparcial's employees went on strike on May 26, 1960, and picketed the building in which both it and Star had their offices and the former had its printing plant. From the outset there was violence on the picket line and on May 30 Star's 124 employees refused to cross the picket line to report for work for fear of per-sonal injury. Negotiations between Star's president and publisher and lower union officials having come to naught, Star's president met by appointment with one Chavez, the Union's regional organizer. At this meeting Chavez said his Union had "nothing against" Star and that the pickets were not stopping Star employees from entering the building and asked what he was expected to do. Star's president said that he wanted the Union to assure his men that they would not be molested and that they were not in any danger. Chavez promised to give that assurance provided "you will agree that your men will not enter the El Imparcial part of the building, that they will not help El Imparcial in any way, and that you will not use any of El Imparcial's equipment." Star's president and publisher agreed. Thereupon Star ceased having its printing done under its contract with El Imparcial and made arrangements to have its paper printed on the presses of another newspaper, the "Island Times." Thereafter Star employees wearing identifying placards entered the building without interference by the pickets.

The court below found that soon after the strike began the Union embarked on a campaign to compel persons to stop advertising in "El Imparcial" and in furtherance of that objective "threatened, coerced and restrained" two advertising agencies engaged in the business of placing advertisements for clients, some of whom were engaged in interstate commerce, and also Goodyear Western Hemisphere Corp. which operated a retail store and re-tread plant in Hato Rey, Puerto Rico, selling a variety of imported goods, and Cerveceria Corona, Inc., a local brewery, "with strike activities or other reprisals" unless they stopped advertising in "El Imparcial." Basically on these facts the court below found reasonable cause to believe that the Union had and was engaged in acts and conduct in violation of the secondary boycott pro-

2. Also, occasionally when there was a rush job El Imparcial made photo-engravings and line cuts for Star; and until Star obtained a shaver for shaving flat castings this was done at the El Imparcial plant.

visions of the Act cited above and that unless enjoined the acts and conduct were likely to be repeated or continued.

There can be not doubt, indeed the appellant-Union does not seriously dispute, that Chavez's conduct as agent for the Union had the effect of restraining or coercing Star by requiring it as a condition of continued publication "to cease doing business" with El Imparcial. On this phase of the case the Union's basic contention is that the affairs of Star and El Imparcial were "so intertwined" that Star was not a "secondary employer" or "neutral" with respect to the Union's dispute with El Imparcial but that on the contrary Star's and El Imparcial's business relationship made them "co-employers" or at least "allies." There is no factual basis for this contention.

■ The undisputed facts are that Star and El Imparcial are separate and distinct corporations without any common ownership or control and that each has a separate staff and separate employees. Their only relationship was under the contract described above. Star was not performing "struck work" for El Imparcial nor were their businesses so integrated or intertwined operationally that Star was deprived of the protection afforded by the Act. Compare Douds v. Metropolitan Federation of Architects, D.C.S.D.N.Y.1948, 75 F.Supp. 672; Local 24, International Brotherhood of Teamsters, etc., v. N. L. R. B., 1959, 105 U.S.App.D.C. 271, 266 F.2d 675, 680. The fact that Star employees participated in the work of bundling Star papers after they were delivered by El Imparcial employees to El Imparcial's mailing room or that on occasion El Imparcial performed some extra services for Star as an accommodation does not alter the situation. The plain intent of sub-paragraph (B) of the statute is to prohibit conduct aimed at terminating the very sort of business relationship which existed here.

One prong of the Union's attack on the District Court's findings with respect to the two advertising agencies rests on the erroneous assumption that the court found that the respective presidents of the two corporations as individuals were induced or persuaded to cease doing business with El Imparcial. We do not pause to analyse or even state this contention for the court's actual finding was not that it was the individuals but that it was the corporations represented by those individuals which were threatened, coerced and restrained through pressure applied to their managerial officers which, of course, is the only way pressure could be applied to the corporations. The other prong of the attack is directed to the evidentiary support for the court's finding that the agencies actually were threatened or coerced.

The evidence in outline as to one of the agencies, Highley-Soria Advertising Co., is that a person identifying himself as "Chavez of the Teamsters" called that agency's president on the telephone and, using strong language, mentioned the strike and "questioned placing advertising in 'El Imparcial.'" When the agency's president said he did not wish to discuss the matter over the telephone but would be happy to talk it over in his office, the speaker called the agency's president a foul name, said that he would close the agency, call strikes against its clients and picket the agency.

■■ The Union contends that this evidence was improperly admitted for failure to identify Chavez as the speaker over the telephone and the same contention is made with respect to the admission of evidence of another similar telephone call made to the manager of the Goodyear store. But no objection was made in the court below to the admission of evidence of either of these telephone calls. Objection for the first time in this court comes too late for it is now too late to cure the objection by introducing other evidence of the identity of the one who called on the telephone, perhaps by calling Chavez himself to the witness stand. The rule that objectionable evidence must be objected to at the trial is not a technical one. Its purpose is to afford the one who offers the evidence an opportunity at the trial to cure the

objection and so obviate the necessity for another trial. The rule is both elementary and for obvious reasons eminently practical.

The Union's contention as to the other advertising agency and also the Goodyear store is that the evidence does not warrant a finding that either was "threatened, coerced and restrained" as the court below found, but at the most warrants only a finding that they were induced or persuaded not to advertise in "El Imparcial." The line between threats, coercion and restraint on the one hand and mere persuasion on the other is not always easy to draw and cannot by any means always be drawn by reference only to the words used. Words innocuous in themselves can take on a sinister meaning in the context in which they are uttered. Thus, although the words used to the managing officer of this advertising agency and of the Goodyear store, *in vacuo*, may have been innocent, in the context of the bitter labor dispute with El Imparcial in which the words were spoken they can reasonably be regarded as ominous. The construction put on the words by the court below was not clearly erroneous.

The finding that the Union induced or encouraged the employees of Cerveceria Corona, Inc., to engage in a work stoppage to coerce their employer to stop advertising in "El Imparcial" rests upon the wording of handbills which the Union freely admits circulating at the brewery. These handbills first called attention to the strike at El Imparcial saying that it "continues strong and vigorous," and then in scathing terms characterized El Imparcial's president as the "most anti-labor employer in all Puerto Rico and maybe in all America." The handbill then continues; "We believe that every person who buys El Imparcial and every advertiser who advertises in this newspaper is helping to weaken the strike for he is cooperating with the most monstrous employer in Puerto Rico." After this the handbill points out that Cerveceria Corona is still advertising in "El Imparcial" "although the ad does not produce anything since El Imparcial IS NO GOOD and circulates little," and then concludes:

" * * * You, the fellow workers of Corona, know what this means. If some day you have differences with the employer, El Imparcial will be against you. For that reason, because of the fellowship that should unite *all* of us workers, we are asking you to insist with Corona *so that it doesn't advertise in El Imparcial,* because it is equivalent to contributing to break a strike and because other means produce better results. We, the strikers of El Imparcial, will help you at any time you need our help. Help us keep our movement, which is yours, strong.

Fraternally, *Strike Committee of El Imparcial."*

The encouragement of strike action by Corona's employees to force their employer to cease advertising in "El Imparcial" is at the best only thinly veiled in the statement " * * * we are asking you to *insist* (italics supplied) with Corona *so that it does not advertise in El Imparcial * * *."* In the context of the strike accompanied by violence, of which there is ample evidence, at El Imparcial's place of business the court below did not err in reading the handbill as having that proscribed purpose.

In summary it will suffice to say that we find ample evidence to support the findings made by the court below.

Judgment will be entered affirming the order of the District Court.