**HERBERT BURMAN, INC., Plaintiff,**

v.

**LOCAL 3 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Local 144, Hotel & Allied Services Employees Union, Local Joint Executive Board of New York City Hotel & Restaurant Employees & Bartenders International Union AFL–CIO, John Doe, Jane Doe, Richard Roe, John Smith and Sally Smith said last five names being fictitious, the persons intended being employees of the Hotel New Yorker, and members, employees and/or agents of the first three named defendants, Defendants.**

United States District Court
S. D. New York.
Jan. 30, 1963.

354

Frackman & Robins, New York City, for plaintiff; Leonard M. Frackman, New York City, of counsel.

Harold Stern, New York City, for defendant Local 3 International Brotherhood of Electrical Workers AFL-CIO.

Boudin, Cohn & Glickstein, New York City, for defendant Local 144, Hotel & Allied Services Employees Union; Jerome B. Lurie, New York City, of counsel.

McLEAN, District Judge.

This is an action for damages allegedly sustained by plaintiff as the result of a secondary boycott. Plaintiff claims that defendants, in violation of Section 8(b) (4) (ii) (B) of the National Labor Relations Act, as amended (29 U.S.C. § 158 (b) (4) (ii) (B)) threatened and coerced the Hotel New Yorker into cancelling its contract with plaintiff, an electrical contractor, for the performance of certain electrical work at the hotel.

Local Joint Executive Board, named a defendant, was not served and did not appear. Defendants Local 3 International Brotherhood of Electrical Workers AFL-CIO ("Local 3") and Local 144 Hotel & Allied Services Employees Union ("Local 144"), moved to dismiss the complaint at the close of plaintiff's case, and rested on that motion, without offering any evidence. I find the facts established by plaintiff's evidence to be as follows:

Plaintiff is a New York corporation engaged in the electrical contracting business. Its gross volume of business was approximately $1,000,000 in each of the years 1960 and 1961. In each of those years it purchased materials having a value of approximately $400,000. It purchased a substantial portion of those materials from manufacturers and jobbers located in states other than New York by whom they were shipped to job sites in New York.

Plaintiff's employees were not members of defendant Local 3. They belonged to another union known as Industrial Workers of Allied Trades, Local 199, with which plaintiff had a collective bargaining agreement.

On April 14, 1961 plaintiff entered into a contract with the Hotel New Yorker to supply all labor and materials necessary to create additional power facilities at the hotel. The work was to consist primarily of installing 15 sets of heavy cable in pipes in connection with an existing switchboard, installing risers containing cables, and installing outlets for window air conditioners on certain of the upper floors of the hotel. The total contract price of the work was $55,000.

After the contract was signed, plaintiff applied to the city authorities for the necessary permits and began some preliminary survey work. On April 28, 1961 the Hotel New Yorker wrote to plaintiff cancelling the contract. In this letter the hotel stated as its reason for cancelling that:

"We are under an agreement with the New York Hotel Trades Council whereby all electrical work on our premises is to be performed by members of Local 3 exclusively."

By reason of this cancellation, plaintiff was deprived of the gross profit which it would have made on this job, which plaintiff estimates at 20 per cent of the contract price. Although plaintiff suggested that, but for the cancellation, plaintiff would have received additional contracts from the hotel, the evidence on this subject does not rise above the level of conjecture.

The Hotel New Yorker is a member of the Hotel Association of New York City, Inc. On July 8, 1959 that association, on behalf of its members, entered into a collective bargaining agreement with the New York Hotel Trades Council, acting on its own behalf and on behalf of a number of local unions affiliated with it, two of which were defendants Local 3 and Local 144. The agreement was signed by the Council and also by each of its affiliated locals. The agreement established wages, hours and working conditions for all hotel employees, with certain exceptions not material here. Electricians were included. Section 4 of the agreement provided that all employees covered by the agreement should be members of the union. Section 24(A) of the agreement entitled "Concessionaires," provided that:

" * * * the provisions of Section 4 of this Agreement shall apply

to any contractor, concessionaire or lessee doing business or rendering services incidental to hotel operations within the hotel which employs employees in job classifications covered by this Agreement. The wages, hours and other conditions of employment provided for in this agreement shall be applicable to such employees."

Section 17 of the agreement provided that the union would not call or engage in any strike or work stoppage or picketing or any other interference with the conduct of the employer's business for any reason whatsoever.

A supplementary letter dated on the day on which the collective bargaining agreement was executed provided:

"The UNION and the employees agree that they will not, at any time, either directly or indirectly, interfere with or prevent the EMPLOYER from purchasing merchandise or any service requirements which it may desire from any source whatsoever because of the employment by the said source of non-members of a union or non-union workers, and the UNION and the employees further agree that they will not refuse to handle, sell, deliver or work on any such merchandise which may be so purchased."

On April 24, 1961, James L. O'Hara, secretary of the New York Hotel Trades Council and also an officer of defendant Local 3, called upon Harvey Schwartz, the vice president of the Hotel New Yorker. O'Hara said that he had heard that the hotel was contemplating having certain electrical work done at the hotel by a contractor whose employees did not belong to Local 3. He said that under the terms of the collective bargaining agreement members of Local 3 were to do all the work at the hotel, and that consequently, the Hotel New Yorker would violate its contract if it did business with this contractor. This was the sum total of O'Hara's statement, as far as plaintiff's evidence discloses. O'Hara and

Schwartz, each called as witnesses by the plaintiff, each testified to this conversation to substantially the same effect. This conversation was the cause of the action taken by the hotel on April 28 in cancelling its contract with the plaintiff.

■ Before we reach the merits of this controversy, a preliminary question of jurisdiction must be considered. I find that plaintiff was engaged in interstate commerce. McLeod v. Chefs, Cooks, Pastry Cooks and Assistants, etc., 181 F. Supp. 742 (S.D.N.Y.1960), modified on appeal on another point 280 F.2d 760 (2d Cir., 1960).

Before the 1959 amendments to the National Labor Relations Act, this fact alone would have been sufficient to confer jurisdiction in a secondary boycott case. As the statute read prior to the amendments, Section 158(b) (4) prohibited certain activities in the way of a secondary boycott directed against "any employer," with no qualification of that phrase. Jurisdiction depended upon the general provisions of Section 187(a) and (b) which made the Act applicable to "an industry or activity affecting commerce." The jurisdictional requirement was satisfied if the primary employer, in this case the plaintiff, was engaged in interstate commerce. N. L. R. B. v. Denver Building & Construction Trades Council, et al., 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); International Brotherhood of Electrical Workers, et al. v. N. L. R. B., 181 F.2d 34 (2d Cir., 1950), affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

In amending 29 U.S.C. § 158(b) (4) in 1959, however, Congress added qualifying language which made the secondary boycott provisions relating to a secondary employer, in this case the Hotel New Yorker, applicable only to an employer who is "engaged in commerce or in an industry affecting commerce." Plaintiff has offered no evidence in this case which would support a finding as to the nature of the business activities of the Hotel New Yorker. In this respect the record differs from that in a proceeding referred

to by plaintiff which was brought by the Board for a preliminary injunction restraining defendant Local 3 from alleged violations of the section. The Board's petition in that case contained allegations describing the hotel's business. The fact that this court took jurisdiction of that proceeding, therefore, is of no relevance in the present case. The question is here presented as to whether this complaint must be dismissed for failure of proof of a necessary jurisdictional fact.

The National Labor Relations Board has taken jurisdiction in secondary boycott cases where there was no proof of the activities of the secondary employer. Sheet Metal Workers Int'l. Assn., Local 299, etc., 131 N.L.R.B. p. 1196 (1961); Plumbers Union of Nassau County, Local 457, 131 N.L.R.B. p. 1243 (1961).

The assumption of jurisdiction by the Board in the second of these cases was expressly affirmed by the Court of Appeals in N. L. R. B. v. Plumbers Union of Nassau County, Local 457, etc., 299 F.2d 497 (2d Cir., 1962).

As the Board pointed out in the Sheet Metal Workers case, supra, the legislative history of the 1959 amendments does not reveal the reason for the inclusion of the new language relating to secondary employers in Section 158(b) (4). The legislative history does indicate, however, that Congress was primarily concerned with strengthening the prohibition of secondary boycotts, and that it acted in the belief that the statute, as amended, would prohibit all activity of this sort which was "covered by the present law" and other activities not previously covered as well. Senate Resolution 181, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (Vol. II) pp. 1382, 1383.

Consequently, to say that the amendment set up new jurisdictional requirements, thereby restricting the coverage of the statute as compared with what it had previously been, would seem to be contrary to the fundamental intent of Congress.

A way out of the dilemma is provided by the statutory definition of "industry affecting commerce" contained in 29 U. S.C. § 142(1) as:

> " * * * any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce."

██ Under this definition, if a labor dispute between a union and a secondary employer would tend to "burden commerce," or to "obstruct the free flow of commerce," the secondary employer is automatically in "an industry affecting commerce," and hence the jurisdictional requirement is satisfied. This I take to be the basis of the result reached in the cases cited above. That principle applies here. A dispute between the union and the hotel which prevented the performance of plaintiff's contract would burden the commerce in which plaintiff is engaged and would also obstruct the free flow of commerce in that it would prevent the transportation of materials from points outside the state to the site of the job within the state. That has in fact been the effect of the union's activities in this case. I hold, therefore, that the conduct complained of was directed against an employer "engaged in an industry affecting commerce" within the meaning of Section 158(b) (4) (ii) (B), and that this court has jurisdiction of the controversy.

I turn now to the merits. Section 158 (b) (4) (ii) (B) provides that it shall be an unfair labor practice for a labor organization or its agents "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is * * * forcing or requiring any person * * * to cease doing business with any other person."

It is the position of both defendants that plaintiff has failed to prove a prima facie case of a violation of this section. This comes down to the contention that O'Hara's statement to Schwartz to the

effect that the performance of this work by plaintiff would constitute a breach of the hotel's collective bargaining agreement with the union is insufficient to support a finding that O'Hara has "threatened, coerced or restrained" the hotel.

In Alpert v. Excavating & Building Material Chauffeurs, etc., 184 F.Supp. 558 (D.Mass.1960), Judge Wyzanski held that Section 158(b) (4) (ii) (B) was not violated by the action of a union official in advising a secondary employer that its agreement with the union prevented it from doing business with the primary employer. The court said (184 F.Supp. 558 at 561):

> " * * * no legislative history has been drawn to my attention which indicates that Congress sought to preclude a union from making to an *appropriate* representative of management a *non-threatening* plea that the employer should abide by its *valid* contracts."

■ That decision would be persuasive authority here were it not for one fact which affords a possible basis of distinction. The agreement there between the union and the secondary employer in terms prohibited the employer from dealing with non-union contractors. The court stressed that fact, and held further that the contract was nevertheless valid under Section 8(e) of the Act (29 U.S.C. § 158(e)), which prohibits, except in the construction industry, a labor organization and an employer from entering into a contract whereby the employer agrees not to do business with any other employer. The Alpert contract, since it involved an employer in the construction industry, came within the statutory exception. In the present case, on the other hand, the collective bargaining agreement does not seem to prevent the hotel from doing business with employers of non-Local 3 labor for electrical work of the type here involved. Paragraph 24(a), which conceivably could have that effect, could more reasonably be interpreted to apply only to concessionaires and persons permanently stationed within the hotel, rather than to outside contractors employed for a particular job of some magnitude. This construction is reinforced by the letter signed simultaneously with the execution of the contract, which specifically permits the hotel to "purchase merchandise or any service requirements" from "sources" who employ non-union labor. Although the "purchase of service requirements" from a "source" is hardly a felicitous or unambiguous phrase, I believe that it was intended to cover services of the type which this plaintiff contracted to furnish. Moreover, unless the contract is so construed, it might well be violative of Section 8(e). I find, therefore, that the collective bargaining agreement did not prevent the hotel from entering into the contract which it made with the plaintiff.

At the time of his conversation with Schwartz, O'Hara conceivably may have had a different view of the meaning of the collective bargaining agreement. O'Hara testified, however, that he was familiar with the provisions of the supplementary letter. Presumably he knew what it was intended to mean. The more likely hypothesis is that O'Hara was aware of the fact that the hotel would not break the collective bargaining agreement if it carried out its contract with the plaintiff. I shall assume that to be the fact for the purposes of the discussion which follows.

We thus do not have an attempt by a union official to enforce a valid collective bargaining agreement, as in Alpert v. Excavating & Building Material Chauffeurs, etc., supra, but rather an attempt by a union official to convince the secondary employer that the collective bargaining agreement prevented what it did not in fact prevent. This situation is unlike that presented in any of the cases cited by the parties, or in any case which the court's own research has produced. Faced with what appears to be a case of first impression, the court must decide whether on these facts the secondary employer was "threatened, coerced or restrained."

■ A threat is "the expression of an intention to inflict evil or injury on another." Webster's New International Dictionary, 2d Ed.

There is nothing in O'Hara's statement which expressly revealed such an intention. But a threat may be implied, as well as express. "Words innocuous in themselves can take on a sinister meaning in the context in which they are uttered." Local 901, International Brotherhood of Teamsters, etc. v. Compton, 291 F.2d 793 (1st Cir., 1961).

In that case the court held that it was not clearly erroneous for the District Court to find that the words used by the union official to the secondary employer amounted to a threat, in the context of the "bitter labor dispute" between the union and the primary employer.

What is the context here? As far as appears, there was no dispute, bitter or otherwise, between the union and the plaintiff. There is no evidence of prior dealings between them. Plaintiff already had a contract with another union, and there is nothing to indicate that O'Hara was motivated by a desire to put indirect pressure on the plaintiff to sign a contract with Local 3. In this respect the case differs significantly from the typical secondary boycott situation.

It is clear that O'Hara's action induced the hotel to cancel plaintiff's contract. It caused the cancellation. But although an inducement is enough to violate another section of the Act, i. e., Section 158(b) (4) (i), and although still another section, Section 158(b) (2), is violated by conduct which "causes" certain action by an employer, as in N. L. R. B. v. Oklahoma City General Drivers, etc., 235 F. 2d 105 (10th Cir., 1956), cited by plaintiff, the standard set up by Section 158 (b) (4) (ii) (B) is more strict. To "induce" or to "cause" is not to "threaten, coerce or restrain," even though the line between the two may be hard to draw. Local 901, International Brotherhood of Teamsters, etc. v. Compton, supra.

■ I feel that it would unduly extend the scope of Section 158(b) (4) (ii) (B) to hold that the words used in this case constituted an implied threat, merely because they did not accurately state the meaning and effect of the collective bargaining agreement. If it is not a threat to tell an employer that a collective bargaining agreement prevents certain conduct when that statement is true, I do not see that it is any more of a threat to tell him so when the statement is false. The statement is no more an expression of an intent to inflict injury in the latter case than in the former. In the one case the statement is a misrepresentation and in the other it is not, but we are concerned here only with threats, not with misrepresentations. I conclude that the union did not contravene the statute by "threatening" the Hotel New Yorker.

Did it "coerce" or "restrain" the hotel? I conclude that it did not. To "coerce" is to "compel to any action;" to "restrain" is to "limit, confine or restrict." Webster's New International Dictionary, 2d Ed. Doubtless acts may be compelled or restrained either by words or by physical conduct. There was no physical conduct here. There was no strike, no picketing. There were only words. And it seems reasonable to say that if the words did not amount to a threat, then they did not amount to coercion or restraint. Words which are not threatening do not compel. At most, they persuade or induce.

In view of the conclusion that the statement made by O'Hara did not violate Section 158(b) (4) (ii) (B), it becomes unnecessary to consider the separate contention made by defendant Local 144 that in any case it was not bound by that statement because, although O'Hara was an officer of the Council of which Local 144 was a member, he was not an officer of the Local itself.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Defendants' motion to dismiss the complaint is granted. The clerk is directed to enter judgment in favor of defendants. So ordered.