**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 571, Respondent.**

**No. 17154.**

United States Court of Appeals Eighth Circuit. May 20, 1963.

Glen M. Bendixsen, Attorney, National Labor Relations Board, Washington, D. C., Stuart Rothman, General Counsel, N. L. R. B., Washington, D. C., Dominick L. Manoli, Associate General Counsel, N. L. R. B., Washington, D. C., Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C. and Warren M. Davison, Attorney, N. L. R. B., Washington, D. C., on the brief, for petitioner.

David D. Weinberg, Omaha, Neb., for respondent.

Before VOGEL, VAN OOSTERHOUT and RIDGE, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

The National Labor Relations Board here petitions this Court for enforcement of its September 20, 1961, order against respondent Local 571. The petition is made and jurisdiction established under § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e). The Board's decision and order are reported in 133 N.L.R.B. 208.

Local 571 was charged with violation of NLRA § 8(b) (4), as amended, 29 U.S. C.A. § 158(b) (4),[1] by threatening, coercing, and restraining secondary employers (Paulson Construction Company and Rocco-Ferrera Company, Inc.) with the objects of (1) forcing or requiring such secondary employers to cease doing business with Layne-Western Company (the primary employer and the charging party herein) and (2) forcing or requiring Layne-Western to recognize or bargain with Local 571 even though Local 571 had never been certified as the representative of Layne-Western's employees.

The Board's order prohibiting further violations is entitled to enforcement unless, considering the record as a whole, the underlying findings of fact are not supported by substantial evidence or unless the conclusions of law or the terms of the order itself are not justified by the purposes and policies of the Act. NLRA § 10(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U. S. 318, 342–343, 60 S.Ct. 918, 84 L.Ed. 122; National Labor Relations Board v. Buitoni Foods Corp., 3 Cir., 298 F.2d 169, 171, 175–76; Puerto Rico S.S. Ass'n v. N.L.R.B., 108 U.S.App.D.C. 252, 281 F.2d 615, 618; National Labor Relations Board v. International Union of United Brewery, etc., Workers, 10 Cir., 272 F.2d 817, 820; National Labor Relations Board v. Retail Clerks Int'l Ass'n, 9 Cir.,

---

1. The statute declares that it shall be an unfair labor practice for a labor organization or its agents

"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where * * * an object thereof is—

＊　　＊　　＊　　＊　　＊

"(B) forcing or requiring any person * * * to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees * * *."

243 F.2d 777, 779 n. 2; National Labor Relations Board v. National Garment Co., 8 Cir., 166 F.2d 233, 238–39.

■ As we have stated in Bachman Machine Co. v. N. L. R. B., 8 Cir., 266 F.2d 599, 605:

"Where the views of the Board as applied are in conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own, the views of the Board should, no doubt, be accepted."

Layne-Western, a Delaware corporation whose principal place of business is in Kansas City, Missouri, deals in well pump equipment and allied products, and it also does drilling and boring for various purposes. It maintains an office in Omaha, Nebraska, which is where Local 571 is located and where the present dispute arose. Layne-Western has employed members of Local 571, but that organization has never been certified to represent Layne-Western's employees, nor has it ever secured a written collective agreement from Layne-Western.

In October of 1960 Layne-Western was engaged as a subcontractor to perform drilling jobs on projects of Rocco-Ferrera and Paulson.[2] Rocco-Ferrera's project was the construction of a sewer for the City of Omaha, and Paulson's was the construction of a store-warehouse in Omaha. When Layne-Western undertook to perform the jobs, agents of the respondent Local 571 appeared and made certain statements to agents of Layne-Western, Paulson, and Rocco-Ferrera concerning Layne-Western and its employees. The Board's order is based upon those statements and the surrounding circumstances.

I.

On October 21, Local 571 agents came into Paulson's store-warehouse jobsite and attempted or threatened to shut down Layne-Western's operations. A number of Layne-Western's employees testified that the reason given for wanting the drilling shut down was that Layne-Western was paying below union scale wages, and employing nonunion men. Dyas, Layne-Western's field superintendent, testified:

"He [respondent's business manager Goebel] said he was going to fine * * * [two of the employees] $500 a piece and pick up their union cards. At that time I suggested that would be a wonderful idea if he would do that, that we would probably be better off if none of the men were in the union, and that we had had nothing but trouble from him, and he said if we would sign a union contract we wouldn't have any trouble. He also said that we were not paying union scale on the job."

Also on October 21, Paulson's general superintendent Mike Paulson talked with Local 571 agents. He testified:

"Mr. Metzler [Local 571 business agent] said, 'Mike, if you don't have Layne-Western shut down I'm going to have to shut you down.' And I said, 'We'll see if we can't have them shut down,' because I sure didn't want to get shut down, so I went to talk to Harvey the foreman for Layne-Western and asked him if he could shut down without damaging anything."

After it was learned that an immediate shut-down of Layne-Western would risk damage to other phases of the project, Mike Paulson talked with Mr. Goebel (of Local 571):

"I asked Mr. Goebel what I could do to alleviate the situation.

"Q. What did he say? A. And he said he wasn't going to strike

2. Layne-Western was engaged on the Paulson project by the Hanighen Construction Company. Paulson was the general contractor, and Hanighen a "prime subcontractor."

me, but he said in the future not to hire Layne-Western or there would be trouble."

On October 24, before Layne-Western had even begun drilling for Rocco-Ferrera, Goebel appeared at that jobsite and spoke with Rocco-Ferrera's project manager Smith. According to Smith's testimony, Goebel pointed out that Layne-Western was a nonunion organization, that it had no union contract, and that it paid below union scale wages. Goebel said he didn't want Layne-Western on the sewer project and that Local 571 would strike the project if Layne-Western's men were brought in. Smith later informed Layne-Western's superintendent Dyas that he wished to cancel the contract with Layne-Western "in view of the fact that the union was threatening a strike if we used his men and equipment." Consequently, Layne-Western never did work on the sewer project.

On October 26, Local 571 sent copies of a letter to contractors in the Omaha area, informing them of its dispute with Layne-Western. The body of the letter is quoted in the footnote.[3]

■ We conclude that the evidence outlined above affords substantial support for the Board's findings (a) that Paulson and Rocco-Ferrera were neutral secondary employers, (b) that respondent Local 571 threatened, restrained, or coerced them, and (c) that the object of respondent's conduct was to force them to cease doing business with Layne-Western and to force Layne-Western to bargain with or recognize Local 571. Testimony given by union officials would support contrary findings, but we cannot say that the record as a whole fails to support the Board's position. Compare National Labor Relations Board v. Bendix Corp., 6 Cir., 299 F.2d 308, 310; National Labor Relations Board v. Jackson Tile Mfg. Co., 5 Cir., 282 F.2d 90, 93.

II.

■ Local 571 challenges the Board's additional finding that Paulson and Rocco-Ferrera, the secondary employers, were "engaged in commerce or in an industry affecting commerce" as required by the statute. The Trial Examiner initially recommended dismissal of the complaint upon this basis, but the Board disagreed. The Board followed its decision in Sheet Metal Workers Int'l Ass'n, 131 N.L.R.B. 1196, 1198–1200, which reasons that the building and construction industry is "an industry affecting commerce" within the meaning of § 8(b) (4).

Similar reasoning has been followed in National Labor Relations Board v. Plumbers Union, 2 Cir., 299 F.2d 497, 500 (enforcing the order of 131 N.L.R.B. 1243), and in Herbert Burman, Inc. v. Local 3, IBEW, S.D.N.Y., 214 F.Supp. 353, 356–357. By analogical reference to the broad definition of "industry affecting commerce" in 29 U.S.C.A. § 142 (1), these cases would support the Board's position here upon the grounds that *Layne-Western* is engaged in com-

3. "To All Contractors
"Gentlemen:
"The purpose of this letter is to inform your Company of the facts of a labor dispute with the Layne-Western Company. Our Local Union has been in dispute with Layne-Western over the Payment of union wages and conditions of employment for some time. Layne-Western Company has refused to pay our union's scale and conditions to employees who are within the jurisdiction of this union.
"These facts are presented to your Company for the purpose of information only and to advertise the facts of a la-

bor dispute between this union and Layne-Western Company. We feel that the Layne-Western Company's refusal to pay our scale and conditions tends to depress the scale and conditions we have established for our members in this area.
"In view of the above facts, and the refusal of Layne-Western Company to pay scale and conditions, we wish to inform you that this Company has no signed collective bargaining agreement with the undersigned union.
"The presence of Layne-Western Company on any job wil [sic] create legal and economic problems for the members of our Union."

merce (a fact conceded by all parties).[4] However, we need not go quite so far, for the record in our case shows that Paulson and Rocco-Ferrera were themselves engaged in the building and construction industry.[5]

■ We hold this to be sufficient under § 8(b) (4). We agree with the Board's reasoning on Sheet Metal Workers Int'l Ass'n, supra.

### III.

Local 571 urges that the Board should have applied the Ally Doctrine; it argues that Paulson and Rocco-Ferrera were "allied" with Layne-Western and were therefore not "neutral" secondary employers. The purported alliance is based upon two facts: (1) both Paulson and Rocco-Ferrera offered to supply union men to operate Layne-Western's drilling equipment, and (2) both had agreements with Local 571 which contained subcontractor clauses.[6] We find no substance in either basis.

■ The offers by Paulson and Rocco-Ferrera to supply men were efforts to avoid interruptions in the construction projects, not attempts to "intervene" in the dispute as allies of Layne-Western. The offers were made to Local 571 agents, not to Layne-Western. Similarly, we see nothing in the subcontractor clause which would transform otherwise neutral secondary employers into partisan allies. Contrary to respondent's argument, the clause does not establish any special "privity of contract" between Layne-Western and the secondary employers, much less eliminate Layne-Western's separate status as an independent contractor. Compare National Labor Relations Board v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 689–690, 71 S.Ct. 943, 95 L.Ed. 1284; Bachman Machine Co. v. N. L. R. B., 8 Cir., 266 F.2d 599, 603–605; Kennedy v. Construction Laborers' Union, D.Ariz., 199 F.Supp. 775, 781.

### IV.

■ Finally, respondent contends that the Board's order is too broad in two respects: (1) it fails to acknowledge the union's right to engage in lawful primary activities, and (2) it prohibits the secondary activities directed against Paulson, Rocco-Ferrera, or "any other person engaged in commerce or in an industry affecting commerce except Layne-Western." We can dismiss the first objection without extensive discussion. Local 571 asks only that the order be amended with a general proviso which

4. The cases note that the pre-1959 law covered secondary activities where the *primary* employer was engaged in commerce, whether or not the secondary employer was so engaged. See National Labor Relations Board v. Local 74, United Bhd. of Carpenters, 6 Cir., 181 F.2d 126, 130, aff'd, 341 U.S. 707, 712, 71 S.Ct. 966, 95 L.Ed. 1309. The 1959 amendment, they observe, was intended to *strengthen* the prohibition of secondary activities.

5. Both secondary employers were engaged in the building and construction industry directly rather than tangentially or incidentally. The fact that such industry affects commerce can be judicially noticed—which is not to say the record is entirely barren of supporting evidence in that respect. For example: The Paulson Construction Company is located in Council Bluffs, Iowa, and Layne-Western brought equipment into Omaha from Kansas City for use on the Rocco-Ferrera project. The form letter quoted in footnote 3, supra, and the subcontractor clause quoted in footnote 6, infra, give some slight indication of how far throughout the industry Local 571 may have wanted to carry its disputes with recalcitrant employers like Layne-Western. See generally Shore v. Building & Constr. Trades Council, 3 Cir., 173 F.2d 678, 681 (effect of industry on commerce).

6. "This agreement shall be binding upon the signing contractor, its subsidiaries, assigns and successors and likewise upon subcontractors who are subsidiaries or parent organizations. In the event that work covered by this agreement is contracted for by the signing contractor and then sublet, this agreement shall then be binding upon the subcontractor." The collective agreement with Rocco-Ferrera was oral.

would not alter the effect of the order.[7] We settled this very question in National Labor Relations Board v. International Hod Carriers Union, 8 Cir., 285 F.2d 397, 404.

We also reject Local 571's second basis. We think, in this case, that the Board was justified in extending its order to include secondary employers other than Paulson and Rocco-Ferrera. The Board has "ample discretion" in formulating its orders. National Labor Relations Board v. Cheney Calif. Lumber Co., 327 U.S. 385, 388, 66 S.Ct. 553, 90 L.Ed. 739; National Labor Relations Board v. Local 111, United Bhd. of Carpenters, 1 Cir., 278 F.2d 823, 825; National Labor Relations Board v. U. M. W., 3 Cir., 202 F.2d 177, 179. Once violations have been found in specific instances, the Board is justified in broadening its order to include similar unlawful practices if there is evidence in the record of some general scheme or design or proclivity for such unlawful practices. Communications Workers v. N. L. R. B., 362 U.S. 479, 481, 80 S.Ct. 838, 4 L.Ed.2d 896; International Brotherhood of Elec. Workers v. N. L. R. B., 341 U.S. 694, 705–706, 71 S.Ct. 954, 95 L.Ed. 1299; National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 436–437, 61 S.Ct. 693, 85 L.Ed. 930; National Labor Relations Board v. U. M. W., supra.

We think the order is justified in view of the specific violations found by the Board and the letters (quoted in footnote 3, supra) Local 571 distributed to contractors in the Omaha area. These two facts were connected together by Paulson's testimony: after telling Paulson "there would be trouble" if he ever hired Layne-Western in the future, respondent's agent Goebel expressed his intention to send letters to other contractors asking them not to hire Layne-Western. While the letters themselves do not constitute unfair labor practices,

they do show that respondent's dispute with Layne-Western potentially involves an indeterminate number of secondary employers. The union's "proclivity" for unlawfulness is evidenced by the violations against Paulson and Rocco-Ferrera, not by the letters.

The order will be enforced.

---

7. The amendment requested in respondent's brief is taken verbatim from the proviso of § 8(b) (4) (ii) (B):

"Provided, That nothing contained in this paragraph shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." Nothing in the order purports to make lawful primary activities unlawful.