IT IS FURTHER ORDERED that petitioner inform the Court within sixty days of the action taken in this matter.

**OZARK INTERIORS, INC., Plaintiff,**

v.

**CARPENTERS LOCAL NO. 978 and Carpenters District Council of Kansas City, Defendants.**

No. 89–3321–CV–S–4.

United States District Court, W.D. Missouri, S.D.

Nov. 28, 1990.

Steven E. Marsh, Hulston, Jones & Associates, Springfield, Mo., for plaintiff.

Michael T. Manley, Joseph W. Moreland, Marsha Murphy, Blake & Uhlig, Kansas City, Mo., for defendants.

## ORDER

RUSSELL G. CLARK, District Judge.

Before the Court is defendant Carpenters Local No. 978 and Carpenters District Council of Kansas City's ("Carpenters") motion for summary judgment. Plaintiff Ozark Interior's, Inc. ("Ozark") filed suggestions in opposition to defendant Carpenters' motion for summary judgment. Defendant Carpenters filed a reply to plaintiff Ozark's suggestions in opposition. The Court will grant defendant Carpenters' motion for summary judgment.

Plaintiff Ozark Interiors is engaged in the business of contracting and subcontracting for work. Defendants Carpenters are an unincorporated labor organization representing employees in the construction industry. For purposes of this case, Larry Hall acted as agent for the Carpenters. National Contractors, Inc. ("National") is a corporation engaged in the business of contracting and subcontracting for tenant finish work on commercial building projects.

In 1989 National Contractors negotiated a general contract to perform tenant finish work at the Limited 767 store in the Battlefield Mall in Springfield, Missouri. Certain work was to be subcontracted to other contractors. Mel Smock served as National's Project Manager for the job and Roney Strain served as National's superintendent on the job. National performs work on a union and non-union basis depending on customer requirements and the availability of labor. The Battlefield Mall and the Limited wanted work on the Limited store to be performed by union craftsmen.

National signed a stipulation to be bound by the collective bargaining agreement between the Builders Association of Missouri and the defendants Carpenters which covered carpentry work on the Limited project. The agreement contained a subcontracting clause which provided that whenever a signatory employer subcontracted work, it shall be subcontracted only to employers whose employees receive wages, fringe benefits and other conditions of employment equal to or better than those contained in the agreement between the defendants and the Builders Association.

David P. Moulin, owner and operator of plaintiff Ozark corporation received a call from National's Project Manager Smock soliciting a bid for certain subcontracting work. Moulin submitted a bid and indicated that he was a "union" contractor. Moulin received an unsigned contract from National. The proposed contract included a stipulation that Ozark have a working agreement contract with the local carpenters and painters union. Moulin knew that the Battlefield Mall required union craftsmen on the Limited project.

Carpenter's representative Larry Hall spoke with National's Roney Strain on the job site. Hall inquired whether National would be using Union carpenters on the job. Strain indicated that he did not know who the subcontractors would be but he referred Hall to National's office in Wichita, Kansas. Hall periodically visited the job site and during one visit discussed a pending dispute between Ozark and the Carpenters concerning money claimed for fringe benefits. Smock and Hall spoke by telephone on two occasions during which Hall inquired whether the job would be performed on a union basis.

Hall informed Smock that Ozark did not have a contract with the Carpenters and allegedly told Smock that if Ozark was used there would be "problems" on the job. Smock and Moulin discussed the union status of Ozark's employees during which Moulin told Smock that Ozark employees were not with the "local union trade" but were represented by the Congress of Independent Unions (CIU). Smock advised Moulin that he needed to secure some type of working agreement with the local carpenters and painters union.

David Jones, attorney for Ozark, initiated a series of telephone conversations with Smock, Strain and Hall concerning the Limited project. Jones inquired whether Hall had threatened picketing or any other type of action if Ozark was awarded the contract. Jones also suggested that Hall enter into an agreement with Ozark concerning the Limited project. Hall declined on the basis that he had been advised by the National Labor Relations Board that he could not enter into any contracts with Ozark since its employees were represented by another labor organization—the CIU. The parties did not reach an agreement and Smock told Moulin that National would have to make other arrangements because National needed to start the project. The subcontracting work was ultimately awarded to Mitchell–Slavens, a union contractor in the Springfield area. Smock contacted Mitchell–Slavens after Hall raised questions about Ozark's union status.

On April 26, 1989 Ozark filed a charge with Region 17 of the NLRB alleging that the Carpenters had violated section 8(b)(4)(B) of the Act by threatening to picket at the Battlefield Mall should National use Ozark on the project. The Regional Director for Region 17 subsequently approved Ozark's request that the charge be withdrawn.

Plaintiff Ozark's complaint seeks damages for the loss of anticipated profits from the Limited 767 project and further business it hoped to gain from National allegedly caused by Carpenters' "secondary boycott". Ozark alleges that Carpenters threatened, coerced and otherwise applied pressure to National to induce National to reject Ozark for the subcontracting work. The essence of Ozark's argument is that Carpenters' agent Larry Hall verbally threatened National that Carpenters would picket and/or engage in other unspecified action if National awarded the subcontract to Ozark. Hall denies that any threats were ever made. However, assuming *arguendo* that representative Hall stated that there would be "problems", under the circumstances of this case the alleged reference to mere "problems" is insufficient to establish liability as a matter of law.

■ There are well settled principles in ruling a motion for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact present in the case and judgment should be awarded to the party seeking the motion as a matter of law. *Camp v. Commonwealth Land Title Ins. Co.*, 787 F.2d 1258, 1260 (8th Cir.1986). However, because summary judgment remedy is drastic, it should not be granted unless the moving party has established the right to a judgment with such clarity that there is no room for controversy. *Umpleby v. United States*, 806 F.2d 812, 814 (8th Cir.1986). In addition, the party opposing summary judgment motions may not rest upon the allegations in their pleadings. The nonmovant must resist the motion by setting forth specific facts showing there is a genuine issue of fact for trial. Fed.R.Civ.P. 56(e); *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.

1984). In *Green v. United States Dept. of Labor*, 775 F.2d 964, 973 (8th Cir.1985), the Court stated that such a motion is to be viewed in the light most favorable to the opposing party who also must receive the benefit of all reasonable inferences obtainable from the material before the Court. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) the court held that summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

██ In ruling a motion for summary judgment, the Court does not decide material factual issues, rather it determines whether or not they exist. *Columbia Union Nat'l Bank v. Hartford Accident & Ind. Co.*, 669 F.2d 1210, 1212–13 (8th Cir. 1982). Summary procedures are appropriate where the issues for resolution are primarily legal rather than factual. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Issues of fact must be material to a resolution of the dispute between the parties; where the only disputed issues of fact are immaterial to the resolution of the legal issues, summary judgment is appropriate. *Id.* at 585.

██ With these standards in mind, the Court will proceed to consider defendant's motion for summary judgment. An analysis of Ozark's argument reveals that Ozark has failed to establish the existence of a genuine issue of material fact which would preclude entry of summary judgment in this case. Section 8(b)(4) provides in part:

It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to *threaten, coerce, or restrain* any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

(A) forcing or requiring any employer or self employed person to join any labor organization or employer organization or to enter into any agreement which is prohibited by Section 8(e).

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified a the representative of such employees under the provisions of section 9; Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9.

Subsection (ii) addresses union pressure at the secondary employer. In order to violate section 8(b)(4)(ii) a union must do more than "induce or encourage", the union must engage in conduct "attended by threats, coercion or restraint." *NLRB v. Servette, Inc.*, 377 U.S. 46, 54, 84 S.Ct. 1098, 1103, 12 L.Ed.2d 121 (1964).

Ozark has alleged that Carpenters "threatened, coerced and/or restrained" National with threats of picketing or other action with the objective of forcing National to cease doing business with Ozark and forcing National to deal only with subcontractors approved by Carpenters. Ozark

must do more than show that Carpenter's actions have simply had the effect of inducing or encouraging National to do business with another subcontractor.

■ Section 8(b)(4) reflects the "dual Congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures and controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The Supreme Court and the NLRB have emphasized the narrow scope of conduct prohibited by the statute. First, the statute does not proscribe any type of activity directed at the primary employer with whom the union has a dispute and secondly the statute does not proscribe all secondary activity, only activity which utilizes unlawful objectives or methods. With regard to section 8(b)(4), *Carpenters Local 1976 v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958) states:

> [A]n object must be to force or require their employer or another person to cease doing business with a third person. Thus, much that might argumentatively be found to fall within the broad and somewhat vague concept of secondary boycott is not in terms prohibited ... Likewise, a union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees.

*Id.* at 98, 78 S.Ct. at 1015.

In *NLRB v. Servette, Inc.*, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), the Court held that when a union asked store managers not to handle Servette's items, the union was not:

> attempting to induce or encourage them to cease performing their managerial duties in order to force their employers to cease doing business with Servette.... Finally, the warnings that handbills would be distributed in front of noncooperating stores are not prohibited as "threats" within subsection (ii).

*Carpenters Local 1976* and *Servette* illustrate that Congress did not intend to relieve the primary employer from all consequences of a secondary boycott; the intent was to prohibit specific practices which would constitute threats, coercion or restraint.

Significantly, the NLRB has consistently held that vague references to "problems" or "trouble" are insufficient to constitute a violation of section 8(b)(4)(ii). Such statements are too ambiguous to imply unlawful secondary boycott intent. "Problems" could refer to lawful actions directed toward the primary employer or could refer to a violation of an independent agreement or even that the primary employer's goods and services are inferior.

■ In examining the language used in specific cases, the NLRB applies an objective standard; the uncommunicated belief of the secondary employer is irrelevant. In *Carpenters Dist. Council (Apollo Drywall)*, 211 N.L.R.B. 291 (1974) representatives from the carpenters union told the general contractor that there could be "general complications" if non-union workers were used and the union did not want "trouble" in this regard. The Board stated that the dispositive issue was whether vague references to "trouble" or "problems" rose to the level of threat, coercion or restraint under 8(b)(4)(ii). The Board held that such statements were too vague and ambiguous to constitute a violation of 8(b)(4)(ii); "there is nothing to indicate what form the trouble or problems might take. Any inferences that the vague and unspecific language used referred to future conduct, unlawful under the Act or otherwise, is too remote to sustain a finding of a violation under 8(b)(4)." 211 N.L.R.B. at 295.

In *Teamsters Local 82 (Champion Exposition Services)*, 130 L.R.R.M. 1313, 292 N.L.R.B. 83 (1982) statements to secondary employer that there would be a "problem" if a particular company was hired was not a violation of 8(b)(4)(ii). After the statement was made, the Union did not conduct a strike or picketing which might lend meaning to the alleged threat. The Board

found the evidence too vague and insubstantial to establish a violation. The Board added that the secondary employer's subjective interpretation that the statement constituted a threat of prohibited activity does not determine a violation.

In *Local No. 695, Laborers Int'l Union (Mautz & Oren, Inc.)*, 209 N.L.R.B. 410 (1974) a union representative told the secondary employer "I don't want to cause any trouble but we're not getting along," and "I don't want to [picket], but there may have to be one." The NLRB affirmed the ALJ's determination that use of the word "trouble" did not constitute a prohibited threat. The reference to picketing also did not violate the Act. As with the word "trouble" there was nothing to suggest that the union representative had in mind any picketing that would be other than lawful primary picketing.

*Electro–Coal Transfer Corp. v. General Longshore Workers*, 591 F.2d 284 (5th Cir. 1979) held that it was "permissible for a union to pressure an employer in a primary dispute even though neutral third parties are affected. A union may pursue secondary objectives through peaceful, non-coercive means...." In reference to statements that there would be problems or serious problems if the secondary employer used a non-union subcontractor, the court noted that the NLRB has often held that such statements are ambiguous and do not constitute threats unless accompanied by economic actions such as strikes or picketing that resolve any ambiguity. 591 F.2d at 288.

*Herbert Burman, Inc. v. Local 3 Int'l Bhd. of Elec. Workers*, 214 F.Supp. 353 (S.D.N.Y.1963), involved a union which told the secondary employer that a contract with a subcontractor belonging to another labor organization would violate the secondary employer's agreement with the union. The court held:

It is clear that the [union representative's] action induced the hotel to cancel plaintiff's contract. It caused the cancellation. But although an inducement is enough to violate another section of the Act, i.e., Section 158(b)(4)(i), and although

still another section, Section 158(b)2), is violated by conduct which "causes" certain action by an employer ... the standard set up by Section 158(b)(4)(ii)(B) is more strict. To "induce" or to "cause" is not to "threaten, coerce or restrain" even though the line between the two may be hard to draw.

214 F.Supp. at 359.

Carpenter's cases clearly indicate that the NLRB has consistently held that mere use of the word "trouble" or "problems" is insufficient to establish a violation of 8(b)(4)(ii). Ozark cites numerous cases in its effort to establish that vague references to "problems" or "trouble" violate section 8(b)(4)(ii). However, Ozark's cases are factually distinguishable from the instant case because they involve more than mere ambiguous or vague language.

In *NLRB v. Local 445 (Edward L. Nezelek, Inc.)*, 473 F.2d 249, 82 L.R.R.M. 2485 (2nd Cir.1973), a union specifically threatened to picket and added that, "not a wheel will turn period, nothing will move." In *NLRB v. IBEW Local 453 (Delp Refrigeration Co.)*, 432 F.2d 965, 75 L.R.R.M. 2421 (8th Cir.1970) and *NLRB v. Carpenters Dist. Council (Kaaz Woodwork Co.)*, 383 F.2d 89, 66 L.R.R.M. 2177 (8th Cir. 1967), there were specific threats to picket and picketing actually occurred. However, *Carpenters* noted that in enacting the statute, Congress had the dual objective of preserving the right of unions to bring pressure to bear on offending employers in primary labor disputes. Ozark also cites *Wells v. NLRB*, 361 F.2d 737, 62 L.R.R.M. 2355 (6th Cir.1966), in which the Sixth Circuit held that remarks by a union representative that the general contractor should not "act like a school kid. You know what I'm talking about" coupled with a subsequent request by the union that the subcontractor leave the job removed any ambiguity concerning whether the union representative's statements were intended as a threat. Contrary to the instant case, the *Wells* court found that the "only reasonable interpretation" was that the union had made an unlawful threat to strike.

Similarly, in *NLRB v. Operating Engineers, Local 571*, 317 F.2d 638 (8th Cir. 1963) a union representative stated that "if you don't have Layne–Western shut down, I am going to have to shut you down." 317 F.2d at 641. Although the union said it was not going to strike, the union added that there would be "trouble" if Layne was used in the future. *Local 571* involved a specific threat to shut the project down if the general contractor used a non-union subcontractor. In *IBEW Local 3 (Hyland Elec. Co.)*, 204 N.L.R.B. 193 (1973) after pickets were set up on the site, a union agent stated that if the general contractor did not use a union subcontractor there would be "trouble on the job." *Id.* at 194. The reference to trouble was clearly made in conjunction with actual picketing of the job site. *NLRB v. Carpenters Local 180*, 462 F.2d 1321 (9th Cir.1972) involved three different threats on separate occasions to three different contractors including statements that things would get "kind of rough" if the subcontractor was used and the union threatened to shut down the project if the nonunion subcontractor was used. In the instant case there was never any distinct reference that the Union might attempt to shut down the Limited project. Thus, Ozark's cases fail to support its position that mere references to "trouble" or "problems" constitute a violation of section 8(b)(4)(ii).

■ Ozark's case turns entirely upon statements allegedly made by union representative Hall to the secondary employer National. However, National's Project Manager Smock's own testimony discloses that Carpenters never explicitly threatened to unlawfully picket. In a conversation taped by plaintiff's counsel, Smock initially stated that Hall told him that there would be picketing if National used Ozark on the job. Smock Deposition at 28–31. However, in subsequent testimony, Smock admitted that Hall never specifically mentioned picketing.

Q: [by Donald Jones] ... So what he's trying to do is say I'll picket you if you don't get some other contractor.

A: [Mel Smock] Larry Hall hasn't told me that.

Q: That's what he's really saying.

A: Well, he hasn't directly told me that, but all I want is no problems, period. If you can't do that, I'm sorry. I don't know how other way I can explain it to you, you know.

Defendant's Ex. 9 at 21–22.

Smock's deposition indicates that Hall did not threaten National if Ozark was awarded the job. Smock's testimony confirms that it was merely his subjective understanding that the union was going to picket: "I would think in the industry if they were going to picket it, that's what it means." Smock deposition at 30–31.

Q: Did someone specifically tell you, "We're going to picket" or "I'm going to picket"?

A: Mr. Hall did say that if you use Ozark Interiors, we're going to have some problems. So, therefore, you better use somebody else.

Q: All right. And when he told you "you're going to have some problems," it was you who decided problems meant pickets. Is that correct?

A: [Mel Smock] That's very true because he said you have to do it union and Ozark is not a member of the local carpenters union.

Smock deposition at 51–52. Smock never asked Hall what he meant by "problems."

Q: O.K. Did he indicate what kind of problems?

A: Well, when I took it—as far as that, we're going to have some problems and everything else, it appeared to me the only other problem would incur was as far as a picket.

Smock Deposition at 83–84.

Ozark further cites Smock's deposition to suggest that Hall's reference to problems referred to problems which would be directed at National if it used Ozark. However, Smock's response indicates that Smock assumed Hall was referring to problems between Carpenters and National. Smock responded that he considered the alleged threat was directed to National because

Hall spoke to Smock who represented the general contractor. Smock Deposition at 85–6.

Plaintiff's counsel secretly taped a telephone conversation during which National's project superintendent Strain was adamant that Hall had not threatened him, in any fashion, during Hall's visit to the job site. Exhibit 6 at 9. In fact Strain specifically denied that Hall threatened to picket if National used Ozark. *Id.* Strain added: "He [Hall] hasn't threatened me with nothing. Otherwise, I'd have told him to get out and stay out." Exhibit 6 at 11. When plaintiff's counsel told Strain that Smock said that Hall threatened to picket, Strain responded: "no he hasn't threatened me with a picket." *Id.* Under oath, during his deposition, Strain repeated that Hall did not threaten picketing or any other type of action if Ozark was awarded the contract. Strain Deposition at 8–9, 13, 21, 39.

Plaintiff's counsel also secretly taped a telephone conversation with Carpenter's representative Hall. Jones raised the issue of picketing stating that Hall could not picket Ozark for recognitional purposes. Hall responded "I don't have to picket them for recognition." Exhibit 9 at 14. Hall also stated "No, Don, you know how I can picket them ..." Exhibit 9 at 15. Hall was correct because Carpenters could lawfully picket Ozark on the basis of failure to comply with area standards but this picket would not violate Section 8(b)(4). *See Helgesen v. Ironworkers Local 498,* 548 F.2d 175 (7th Cir.1977). Hall could lawfully tell National that, if Ozark was used on the job, Carpenters would take whatever lawful action was available to them, including a lawful primary picket.

■ Hall's vague and non-specific references to "trouble" or "problems" have consistently been found as a matter of law, not to violate section 8(b)(4)(ii). The fact that Smock may have subjectively assumed that "problems" meant picketing cannot form the basis for liability. The specific language used and the surrounding conduct and events, not the secondary employer's subjective interpretation determines whether Hall's statements constituted a threat of prohibited activity. *Teamsters Local 82 (Champion Exposition Services),* 130 L.R.R.M. 1313, 292 N.L.R.B. 83 (1982).

In addition, a reference to "problems" could refer to a number of lawful primary activities not prohibited by the Act. Smock told Hall that the Mall required the job to be done union and Smock recognized that problems could develop with the Mall and perhaps with the Limited if the job was performed non-union. Smock Deposition at 115–16. Assuming *arguendo* that Hall was alluding to picketing, at least one plausible interpretation is that he was referring to picketing directed solely at Ozark, not at National or any other contractor. *Int'l Bhd. of Elec. Workers (Cleveland Electro Metals Co.),* 221 N.L.R.B. 1073, 1074 (1975). Thus, even if one concludes that the term "problems" was intended to refer to picketing, the evidence does not support Smock's assumption that the picketing would be unlawful. The record is devoid of evidence indicating that Carpenters sought to threaten or coerce National into entering into an agreement to deal only with subcontractors approved by Carpenters. While Ozark's counsel urged Hall to enter some type of agreement, Hall understood that CIU was the exclusive bargaining agent of Ozark employees so Ozark could neither bargain with nor recognize the Carpenters.

Even if National decided not to award the contract to Ozark because of potential "problems", this did not amount to threats or coercion on the part of Carpenters. Carpenters had the right to attempt to persuade the secondary employer to support union goals; including the right to advise the secondary employer of "problems" which might arise from using non-union labor. Furthermore, Carpenters could lawfully advise National that Ozark was not a signatory to a contract with Carpenters and therefore Carpenters might initiate a lawful picket.

In order to preserve the balance between the union's right to bring economic pressure to bear on the primary employer but shield secondary employers from "controversies not their own" the law requires evidence of a much more specific and direct

threat. Ozark has not made a sufficient showing that Carpenter's conduct violated section 8(b)(4)(ii). Under the applicable law, even when construed most favorably to Ozark, Ozark has failed to present a genuine issue of material fact which would preclude this Court from granting summary judgment in favor of Carpenters.

Accordingly, it is

ORDERED that defendant Carpenter's motion for summary judgment is granted.